FILED

09/29/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: AC 17-0694

IN THE ASBESTOS CLAIMS COURT OF THE STATE OF MONTANA

| | |
|---|---|
| IN RE ASBESTOS LITIGATION, <br><br> *Consolidated Cases* | Cause No. AC 17-0694 <br><br> JUDGMENT AND ORDER APPROVING SETTLEMENT (Robinson Insulation Receivership) |

Receiver Nancy Gibson and Allan McGarvey and Mark Kovacich on behalf of certain Libby Plaintiffs have jointly filed a motion (the "Motion") asking this Court to authorize the Receiver's settlement of the insurance coverage claims by Robinson Insulation Company ("Robinson") against ACE Fire Underwriters Insurance Company and ACE Property & Casualty Insurance Company (collectively, "Chubb"), American States Insurance Company ("American States"), and Motorists Commercial Mutual Insurance Company ("Motorists" and, collectively with Chubb and American States, the "Settling Insurers"). A copy of the "Settlement Agreement and Release" (the "Agreement") between the Receiver and the Settling Insurers is attached to the joint motion of the Receiver and certain Libby Plaintiffs, and has been reviewed by this Court.[1]

The court has reviewed the following documentation attached to the Motion and makes these findings based thereon:

(a) Exhibit A is a discovery response filed on behalf of Grogan Robinson Lumber Company ("Grogan"). It establishes, and the court finds, (i) that Grogan was the successor to Lumber Yard Supply and Grogan-Robinson Lumber Company; (ii) ownership and related management of Robinson and Grogan and its predecessors overlapped; and (iii) that, following the winding up of its assets and affairs, Grogan was dissolved in 2018.

(b) Exhibit B is a copy of the Agreement which the Court finds to exhaust the limits of liability coverages in the policies settled thereby.

(c) Exhibit C is an affidavit of Allan McGarvey, attorney for hundreds of Libby asbestos claimants including those with and without claims of exposures during the insurance coverage period. It establishes, and the court finds, that (i) the Agreement was reached following extensive efforts to identify insurance policies potentially providing coverage for claims against Robinson; (ii) despite reasonable efforts, a

---

[1] Unless defined separately herein, all capitalized terms in this Order have the meanings ascribed to them in the Agreement.

EXHIBIT I 001

number of policies and /or declaration sheets, endorsements, and forms for several policies could not be located; (iii) secondary evidence of coverages provided by certain policies was located but was also incomplete; (iv) pleadings in a declaratory judgment action filed in U.S. District Court in Montana were filed setting forth the coverage contentions and defenses of the parties to the Agreement; (v) extensive analysis and negotiation was pursued to reach agreement on the coverages provable and the meanings thereof; and (vi) counsel for all known individuals with claims against Robinson are satisfied that the Agreement exhausts the maximum available coverage under the settled policies.

(d) Exhibit D is a Qualified Settlement Fund Trust which the court finds (i) will receive and hold proceeds of the settlement of the settled insurance; (ii) upon further application to and approval of this court, would distribute such proceeds to resolve claims of those with claims against the Receivership estate which constitute occurrences under the coverages of the settled insurance; and (iii) is the appropriate and necessary and customary mechanism to manage those proceeds, as they must be, for the purpose of resolving corresponding claims.

(e) The affidavits of Allan McGarvey and Receiver Nancy Gibsonestablish, and the court finds, that (i) lawsuits have been filed against both Robinson and Grogan alleging claims for strict product liability for the same asbestos injuries with the difference being that Robinson was primarily a manufacturer of the product while Grogan and its predecessor entities were distributors of the product, (ii) the Settling Insurers have been providing a defense of all such claims under reservation of rights, (iii) plaintiffs' counsel have apprised defense counsel that many lawsuits may be brought against Grogan alleging strict product liability for damages for which Robinson is alleged to also be liable, and (iv) the resolution of the claims against Robinson will therefore not eliminate lawsuits against Grogan for the same injuries or types of injuries.

The court concludes as follows:

(A)    This Court's March 23, 2018 Order (the "Order") creating the receivership granted authority for the Receiver to make demands that the insurers settle claims against Robinson (Order ¶1(c)). The Order, at Order ¶2 (a),(b) requires that the Receiver obtain this Court's approval of "specific proposals" for settlement.

(B)    The proposed settlement entered into by the Receiver and its insurers is appropriately made subject to this Court's approval.

(C)    The settlement is in the best interests of the Robinson and Grogan receivership estates because it is a fair and reasonable compromise of disputed insurance coverage issues. The settlement was negotiated in good faith and at arm's length

EXHIBIT I 002

between the Receiver and Mr. McGarvey, on the one hand, and each of the Settling Insurers, on the other hand.

(D)    The compromise embodied in the Agreement allows the Receiver to liquidate Robinson's and Grogan's insurance coverage for distribution to persons asserting claims against Robinson and/or Grogan, subject to the establishment of a Trust that would, once approved by this court, fairly and equitably distribute the insurance settlement proceeds to those claimants against Robinson and/or Grogan who satisfy the Trust's requirements.

(E)    The Agreement provides, at paragraph 3.3, that each Settling Insurer shall pay its respective settlement amount into a Qualified Settlement Fund ("QSF"), and that the Receiver shall not distribute any funds from the QSF except as authorized by this court.

(F)    The Receiver has provided due and adequate notice of the Motion, the deadline to object to the Motion, the Agreement, and the subject matter thereof to all persons known to have asserted Asbestos Claims (as defined in the Agreement) against either Robinson or Grogan and to all of its other insurers, including Home Insurance Company (in liquidation) and Mission Insurance Company (in liquidation). In addition, to ensure the broadest notice possible, the Receiver and the Settling Insurers have published notice of the (i) Motion, (ii) the hearing on the Motion, and (iii) the Agreement in *USA Today*, *The Western News*, *Kalispell Daily Interlake*, *Missoulian*, *Great Falls Tribune*, and *Helena Independent Record* on [May 26], 2020, in the *Billings Gazette* on [May 27], 2020, and in the *Sanders County Ledger* on [May 28], 2020. Such notice, including the aforesaid notice by publication, was good and sufficient under the particular circumstances to provide adequate and appropriate notice to both known and unknown Asbestos Claimants, and no other or further notice is or shall be required. Accordingly, a reasonable opportunity to object or be heard with respect to the Motion and relief requested herein has been properly afforded to all persons and entities potentially affected by the Agreement.

(G)    The relief sought in the Motion is in the best interests of the Robinson and Grogan receivership estates and the Asbestos Claimants. The Receiver has demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion. The compromise and settlement with the Settling Insurers embodied in the Agreement is consistent with and within the reasonable range of litigation outcomes if the Receiver were to litigate the matters resolved pursuant to this Order.

EXHIBIT I 003

(H)     The compromises contained in the Agreement are a valid and proper exercise of the reasonable business judgment of the Receiver and represent an exchange for reasonably equivalent value. The releases to be given by the Receiver pursuant to Section 5 of the Agreement are appropriate and should be approved. The Settling Insurers would not have entered into the Agreement or any of the compromises and settlements contained therein, or agreed to pay their respective Settlement Amounts, without the benefit of obtaining the releases contained in the Settlement Agreement and the Injunctions contained in this Order.

(I)     This court has inherent equitable authority sufficient to permit it to enter the injunctions contained in Sections 4 and 5 of this Order (the "Injunctions"). The Injunctions are essential to give effect to the settlements and compromises set forth in the Agreement and to fulfill the purposes of both the Robinson and Grogan receiverships. The Settling Insurers have asserted that the Injunctions are a necessary prerequisite for entry into the Settlement Agreement, and the Settling Insurers have informed the Receiver that they will not consummate the settlements and compromises set forth in the Agreement, or pay their respective Settlement Amounts in the absence of the Injunction.

Wherefore, IT IS HEREBY ORDERED and ADJUDGED:

(1)     The Motion is granted.

(2)     The Agreement settling and releasing the insurance coverage claims of Nancy Gibson, as court-appointed Receiver for Robinson and Grogan, against the Settling Insurers is hereby fully and finally approved.

(3)     Settlement proceeds shall be paid to the Receiver, Nancy Gibson, to be held by the Receiver in a QSF, until such time as this court approves the establishment of a Trust and appropriate procedures for the Trust to distribute the settlement proceeds to Asbestos Claimants.

(4)     Pursuant to the Court's inherent equitable authority, (a) all Persons who hold or assert, or may in the future hold or assert, any Claim against Robinson, Grogan, or the Receiver arising in connection with the activities covered by the Policies, or in connection with the activities of Robinson or Grogan giving rise to the Claims that have been made or that could be made under the Policies, and (b) all Persons who may claim to be an insured, additional insured, or otherwise entitled to any benefit under the Policies, are permanently stayed, barred, restrained, and enjoined from asserting any such Claim or right to entitlement, from commencing a proceeding, or taking any other action against ACE Fire Underwriters Insurance Company, ACE Property & Casualty Insurance Company, Motorists Commercial

EXHIBIT I 004

Mutual Insurance Company, or American States Insurance Company (collectively, the "Settling Insurers") or the persons and entities defined in the Agreement as "Insurer Parties" for the purpose of obtaining any recovery or other relief from the Settling Insurers or the Insurer Parties based on, under, arising out of, related or attributable to, and/or in connection with the Policies.

(5)     All claims for contribution, allocation, subrogation, and equitable indemnity, or similar claims, against any of the Settling Insurers (collectively, "Contribution Claims"), whether by parties appearing before the Asbestos Claims Court or not, are hereby BARRED pursuant to the Court's inherent equitable authority. All Contribution Claims against any of the Settling Insurers shall be channeled to the QSF established to hold the Settlement Amounts paid by the Settling Insurers or to any Trust to which the funds in the QSF are transferred following an order by this Court authorizing such transfer.

(6)     This is a final order and judgment for purposes of appeal under Rule 4(1)(a) of the Montana Rules of Appellate Procedure.

9/29/2020

EXHIBIT I 005

Nancy M. Erfle (MT Bar # 4883)
Nathan A. Huey (MT Bar # 27181867)
GORDON REES SCULLY MANSUKHANI, LLP
201 W. Main Street, Suite 101
Missoula, MT 59802
Telephone: (406) 203-5808
nerfle@grsm.com
nhuey@grsm.com

Attorney for Third Party Defendant,
GROGAN ROBINSON LUMBER COMPANY
D/B/A LUMBER YARD SUPPLY

MONTANA ELEVENTH JUDICIAL DISTRICT COURT,|
FLATHEAD COUNTY

| | |
|---|---|
| JEREMIAH HARTLE and KAREN HARTLE, husband and wife, individually and on behalf of their minor children, <br><br> Plaintiffs, <br><br> vs. <br><br> CONAGRA BRANDS, INC., a Delaware for profit corporation; WESTERN BUILDING CENTER, INC., a Montana for profit corporation; and DOES A-Z, <br><br> Defendants. | Cause No. DV-18-532A |
| WESTERN BUILDING CENTER, INC., a Montana corporation, <br><br> Third Party Plaintiff, <br><br> v. <br><br> KENNETH HARTLE, and individual; HUTTIG BUILDING PRODUCTS, INC., a Washington corporation, individually and as successor to PALMER G. LEWIS COMPANY, a Montana corporation; PALMER G. LEWIS COMPANY, a Montana corporation; ACE HARDWARE CORPORATION, a Delaware corporation; ROBINSON INSULATION COMPANY, a Montana corporation; MINOT BUILDERS SUPPLY ASSOCIATION, a Minnesota entity; INDEPENDENT LUMBER AND SUPPLY INC., a Montana corporation; EMPIRE | **THIRD PARTY DEFENDANT GROGAN ROBINSON LUMBER COMPANY D/B/A LUMBER YARD SUPPLY'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION** |

-1-

THIRD PARTY DEFENDANT LUMBER YARD SUPPLY'S RESPONSES TO PLAINTIFFS' FIRST
INTERROGATORIES AND REQUESTS FOR PRODUCTION

Exhibit A 001

5. All responses are based on Lumber Yard Supply's current knowledge and reasonable belief, and Lumber Yard Supply reserves the right to amend or supplement these Objections and Responses.

6. Lumber Yard Supply has made reasonable efforts to respond to Plaintiffs' First Discovery Requests and has not objected to certain of these, interpreting them in such a fashion as to avoid objections when possible and to facilitate the discovery process. If Plaintiff subsequently asserts an interpretation of any Discovery Request that differs from that of Lumber Yard Supply, Lumber Yard Supply reserves the right to supplement its responses and objections.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Please provide a summary of your corporate or business history, including date of incorporation, mergers, consolidations, re-incorporations, and reorganizations.

**ANSWER:** Lumber Yard Supply objects to this Interrogatory on the grounds that the phrase "corporate or business history" is vague and ambiguous. Lumber Yard Supply also objects to this Interrogatory on the grounds that it is not appropriately limited in time or scope. Subject to and without waiving any of its general or specific objections, Lumber Yard Supply states, upon information and belief, that it was incorporated in Montana in 1929 as Twin City Finance Co., at which time it was in the business of financing homes. Twin City Finance Co. ceased operating in the early 1930s, becoming inactive, but was not dissolved. In 1948, the name of the company was changed to Lumber Yard Supply Co., and it began business as a lumber wholesaler. In or about 1993, Lumber Yard Supply Co. merged with Grogan-Robinson Lumber Company, a North Dakota company that had been in the retail lumber business since 1906 (originally incorporated as Mahon-Robinson Lumber Co.). When Lumber Yard Supply Co. and Grogan-Robinson Lumber Company merged in or about 1993, the combined company became known as Lumber Yard Supply Co. and left the retail lumber business, focusing instead on the wholesale lumber business. In January 2002, a fire at Lumber Yard Supply Co. in Great Falls, Montana destroyed nearly all of its records in existence at that time. In approximately March 2015, the assets of Lumber Yard Supply Co., including its name, were sold to Wausau Supply Co. On or about the

-4-

THIRD PARTY DEFENDANT LUMBER YARD SUPPLY'S RESPONSES TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION

Exhibit A 002

date of sale, the name of Lumber Yard Supply Co. was changed to Grogan Robinson Lumber Company for purposes of winding down the company's business. Grogan Robinson Lumber Company dissolved in late 2018. Because of the fire in January 2002, the sale of Lumber Yard Supply Co. to Wausau Supply Co. in 2015, and the dissolution of Grogan Robinson in 2018, access to responsive company records is limited or non-existent. Lumber Yard Supply's investigation is ongoing, and Lumber Yard Supply will supplement its responses to the extent additional responsive information becomes available.

**INTERROGATORY NO. 2:** For each corporation or business entity described above, please describe their activities related to placing vermiculite and/or asbestos-containing products into the stream of commerce. The description should include the name of the corporation or business entity involved; the manner in which asbestos-containing products were placed into the stream of commerce; the specific products involved, detailed year by year and by brand or trade name; and the amount or volume of all such products placed in the stream of commerce.

**ANSWER:** Lumber Yard Supply objects to this Interrogatory on the grounds that it is not appropriately limited in time or scope. Subject to and without waiver of any of its general or specific objections, Lumber Yard Supply states, upon information and belief and without admitting that any of the products to which Plaintiff Jeremiah Hartle may be been exposed contained asbestos, that Lumber Yard Supply Co. sold and distributed Zonolite (an insulation product produced through heat-treatment of vermiculite) to retailers that it purchased on a per-order basis from Robinson Insulation Company. Upon information and belief, Lumber Yard Supply Co. may also have sold cement board (otherwise known as "asbestos board") to retailers, but states that it does not believe it ever was the primary supplier of any product to Western Building Center. Because of the fire in January 2002, the sale of Lumber Yard Supply Co. to Wausau Supply Co. in 2015, and the dissolution of Grogan Robinson in 2018, access to responsive company records is limited or non-existent. Lumber Yard Supply's investigation is ongoing, and Lumber Yard Supply will supplement its responses to the extent additional responsive information becomes available.

-5-

THIRD PARTY DEFENDANT LUMBER YARD SUPPLY'S RESPONSES TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION

Exhibit A 003

Exhibit A004

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release is made as of the Execution Date by all of the Parties: ACE Fire Underwriters Insurance Company; ACE Property & Casualty Insurance Company; Motorists Commercial Mutual Insurance Company; American States Insurance Company; and Nancy Gibson, as Receiver for Robinson Insulation Company.[1]

## RECITALS

A. Robinson has been sued in numerous Asbestos Claims, including in the AC Court, and may be subject to additional such Asbestos Claims in the future.

B. Grogan was sued in the Hartle Claims, which was an Asbestos Claim, and may be subject to additional such Asbestos Claims in the future.

C. Both Robinson and Grogan are dissolved corporations. Robinson is the subject of receivership proceedings in the AC Court.

D. Each of the Insurers issued or is alleged to have issued to Robinson and/or Grogan the respective Policies identified on Exhibits A, B, and C to this Agreement. The Receiver alleges that each of the Policies provides coverage for Asbestos Claims. The Insurers have conducted a diligent search for additional liability policies issued or allegedly issued by each of them or their affiliates to Robinson and/or Grogan that might provide coverage for Asbestos Claims, but have not located policies other than those identified in Exhibits A, B, and C.

E. A dispute exists between the Receiver and Motorists regarding the existence, terms, and/or conditions of some of the Policies listed on Exhibit C, as noted on Exhibit C.

F. The Receiver tendered the Asbestos Claims and the Hartle Claims to the Insurers. The Insurers settled the Hartle Claims pursuant to a settlement agreement approved by the AC Court on April 20, 2020.

G. Each Insurer has agreed to defend Robinson against the Asbestos Claims, subject to reservations of rights.

H. ACE Fire and ACE P&C filed the Coverage Case against the Receiver, American States, and Motorists on November 12, 2019. Each of the defendants filed counterclaims against ACE Fire and ACE P&C and cross-claims against one another. The Coverage Case remains pending.

I. The Parties desire to avoid future disputes concerning the existence and scope of each Insurer's obligation, if any, to provide coverage under the Policies for current and future Claims, including Asbestos Claims, and regarding allocation and payment of Asbestos Claims.

---

[1] All capitalized terms, wherever they appear in this Agreement or in any attachments hereto (including the prefatory paragraph, the recitals, and in the Sections below) have the meanings ascribed to them in Section 1.

- 1 -

J.     By this Agreement, therefore, the Parties by way of compromise and release (i) except as set forth herein, without prejudice to or waiver of their respective positions in matters with persons or entities who are not Parties, (ii) except as set forth herein, without further adjudication of any issues of fact or law, and (iii) without any admission of liability or responsibility, enter into this full and final settlement that releases all rights, obligations, and liabilities of the Insurers under the Policies pursuant to the terms and conditions set forth in this Agreement.

K.     This Agreement is entered into by the Parties in good faith and as the result of (i) an exchange of historical claims data and other information and (ii) arm's-length negotiations among the Parties.

L.     These recitals are incorporated in full into the Agreement.

## AGREEMENT

1.     <u>Definitions</u>.

The following definitions apply to this Agreement and any attachments hereto. They do not apply to any other agreement, including any policy of insurance, nor are they to be used as evidence, except with respect to this Agreement. Each defined term stated in a singular form includes the plural form, each defined term stated in plural form includes the singular form, and each defined term stated in the masculine, feminine, or neuter form includes each of the masculine, feminine, and neuter forms. The word "including" means "including but not limited to."

1.1     "AC Court" means the Asbestos Claims Court of the State of Montana, including in its supervisory role over the Receiver.

1.2     "ACE Fire" means ACE Fire Underwriters Insurance Company, formerly known as CIGNA Fire Underwriters Insurance Company, formerly known as Aetna Fire Underwriters Insurance Company.

1.3     "ACE P&C" means ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company, (1) in its own capacity and right and (2) as assuming reinsurer for Oakwood Insurance Company, successor by merger to Central National Insurance Company of Omaha, but only with respect to those policies issued through Cravens, Dargan & Company, Pacific Coast.

1.4     "Agreement" means this Settlement Agreement and Release.

1.5     "Amended Receivership Order" means Order Granting Receiver Litigation and Settlement Authority (Robinson Insulation Company) entered on or about January 23, 2020 by the AC Court.

1.6     "American States" means American States Insurance Company.

- 2 -

1.7    "American States Settlement Amount" means the total sum of $425,000.00, which amount is in addition to payments to resolve the Hartle Claims.

1.8    "ASI Releasees" means American States, those entities listed on Exhibit D hereto, and each of their direct and indirect parents, joint ventures, subsidiaries, affiliates, officers, directors, employees, agents, representatives, members, and attorneys (including each of their respective predecessors, successors, assigns, heirs, administrators, or executors), all in their capacities as such and as they exist on the Execution Date.

1.9    "Asbestos Claim" means any and all Claims against Robinson or Grogan for bodily injury, personal injury, property damage, damages, wrongful death, or other harm relating in whole or in part, in fact or by allegation, to the presence of, or exposure to, directly or indirectly and in any manner, asbestos or asbestos-containing materials or products, either alone or in combination with any other substance, that were alleged to have been manufactured, installed, removed, fabricated, purchased, sold, supplied, transported, labeled, produced, designed, disturbed, released, used, or in any way at any time held, handled, distributed, installed, marketed, or disposed of by Robinson or Grogan, or for which Robinson or Grogan is otherwise alleged to be responsible.

1.10   "Asbestos Claimant" means any person, in any capacity, asserting an Asbestos Claim.

1.11   "Coverage Case" means the declaratory judgment action pending in the U.S. District Court for the District of Montana captioned *ACE Fire Underwriters Co., et al. v. Nancy Gibson, as Receiver for Robinson Insul. Co., et al.*, Case No. 9:19-cv-00181-DLC-KLD.

1.12   "Chubb" means, collectively, (a) ACE Fire, (b) ACE P&C, and (c) Oakwood Insurance Company as successor by merger to Central National Insurance Company of Omaha, but only with respect to those policies issued through Cravens, Dargan & Company, Pacific Coast.

1.13   "Chubb Releasees" means ACE Fire, ACE P&C, those entities listed on Exhibit E hereto, and each of their direct and indirect parents, joint ventures, subsidiaries, affiliates, officers, directors, employees, agents, representatives, members, and attorneys (including each of their respective predecessors, successors, assigns, heirs, administrators, or executors), all in their capacities as such and as they exist on the Execution Date.

1.14   "Chubb Settlement Amount" means the total sum of $5,000,000.00, which amount is in addition to payments to resolve the Hartle Claims.

1.15   "Claim" means any claim, assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, directive, obligation, suit, lawsuit, action, cause of action, administrative proceeding,

- 3 -

governmental claim or action, order, judgment, settlement, mediation, arbitration, lien, and any other assertion of liability of any kind, whether past, present, or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, matured or unmatured, liquidated or unliquidated, direct or consequential, and whether in law, equity, admiralty, or otherwise. Without limiting the foregoing, Claim includes any matter that would, absent this Agreement, be covered by one or more of the Policies. For the avoidance of doubt, "Claim" does not include the Hartle Claims.

1.16    "Contribution Claim" means any Claim by any insurer of Robinson or Grogan (or guaranty corporation or liquidator authorized to pay claims on behalf, or in lieu, of an insurer of Robinson or Grogan) against any of the Insurers seeking contribution, equitable contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or recovery pursuant to any other theory under law or in equity, arising out of or relating to the payment or defense by such insurer of all or any part of any Claim against Robinson or Grogan, including without limitation any Asbestos Claim.

1.17    "Execution Date" means the last date upon which this Agreement was signed by all of the Parties, as evidenced by the last date on the signature pages hereto. If a signature is not dated by one of the Parties, then the date that Party transmitted the document to the other Parties will be deemed the date of signature for purposes of determining the Execution Date.

1.18    "Final Order" means any judgment or order (a) as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing will then be pending, or as to which any right to appeal, petition for certiorari, or request re-argument or rehearing will have been waived in writing, in form and substance satisfactory to the Parties, or (b) in the event that an appeal, writ of certiorari, or request for re-argument or rehearing thereof has been sought, such order or judgment will have been determined by the highest court to which such order was appealed, or certiorari, re-argument, or rehearing will have been denied, and the time to take any further appeal, petition for certiorari, or move for re-argument or rehearing will have expired.

1.19    "Grogan" means Grogan Robinson Lumber Company, a dissolved corporation.

1.20    "Grogan Entities" means (a) Grogan and its employees, agents or officers, (b) each of its present and future, direct and indirect, parents, joint venture, subsidiaries, partners, and affiliates, solely in their capacities as such, (c) each of its past, direct and indirect, parents, joint ventures, subsidiaries, partners, and affiliates, but only if a person or entity described in (a) or (b) above has the power or authority to act on such entity's or person's behalf, (d) any person or entity asserting entitlement to insurance, rights, or benefits under any of the Policies, including any insured, additional insured, named insured, additional named insured, or protected person,

- 4 -

but only if an entity or person described in (a) or (b) above has the power or authority to act on such entity or person's behalf, (e) the past, present, and future trustees, administrators, officers, directors, employees, agents, representatives, members, principals, and attorneys of any of the foregoing, but only in their capacities as such, and (f) the predecessors, successors, assigns, heirs, administrators, or executors of any of the foregoing, but solely in their capacities as such.

1.21 "Hartle Claims" means all claims by Jeremiah Hartle and Karen Hartle, husband and wife, individually and on behalf of their minor children, that were released pursuant to the Confidential Release and Settlement Agreement among Jeremiah and Karen Hartle, individually and on behalf of their minor children, and the Receiver, effective on or about March 6, 2020, which Confidential Release and Settlement Agreement was approved by the AC Court on April 20, 2020 pursuant to the Order Approving Settlement (Robinson Insulation Receivership).

1.22 "Injunctions" means the injunction and the bar order set forth in Sections 8.1 and 8.2 of this Agreement.

1.23 "Insurers" means, collectively, ACE Fire, ACE P&C, American States, and Motorists.

1.24 "Insurer's Settlement Share" means each Insurer's share as specified in the definitions of American States Settlement Amount, Chubb Settlement Amount, and Motorists Settlement Amount.

1.25 "Insurer Parties" means, collectively, the ASI Releasees, the Chubb Releasees, and the Motorists Releasees.

1.26 "Motorists" means Motorists Commercial Mutual Insurance Company.

1.27 "Motorists Releasees" means Motorists, those entities listed on Exhibit F hereto, and each of their direct and indirect parents, joint ventures, subsidiaries, affiliates, officers, directors, employees, agents, representatives, members, and attorneys (including each of their respective predecessors, successors, assigns, heirs, administrators, or executors), all in their capacities as such and as they exist on the Execution Date.

1.28 "Motorists Settlement Amount" means the total sum of $6.2 million, which amount is in addition to payments to resolve the Hartle Claims.

1.29 "Parties" means each of the Insurers and the Receiver, collectively. "Party" means each Insurer and the Receiver, individually.

1.30 "Policies" means all policies of liability insurance, including the respective Policies identified in Exhibits A, B, and C to this Agreement, whether known or unknown, whether issued or allegedly issued, whether primary, umbrella, excess, or otherwise,

- 5 -

Exhibit B005

issued or allegedly issued prior to the Execution Date by any entity with the definition of Insurer Parties: (a) to any entity or person within the definition of Robinson or Grogan; or (b) under which any entity or person within the definition of Robinson Entities or Grogan Entities, or any of their respective successors or assigns, contends that Robinson, Grogan, or the Receiver are entitled to insurance, rights, benefits, or otherwise; *provided*, however, that (x) any policy of insurance issued to any entity that is not a Robinson Entity or a Grogan Entity is a Policy only to the extent of coverage for the Robinson Entities or Grogan Entities, and (y) any policy of insurance issued to the Receiver is a Policy solely to the extent of coverage for Asbestos Claims and any other Claims arising from the operations, products, or activities of Robinson or Grogan.

1.31 "QSF" means a Qualified Settlement Fund under section 468B of the Internal Revenue Code, to be established by the Receiver, subject to approval by the AC Court, pursuant to Paragraph 2(c) of the Receivership Order and decretal Paragraph 5 of the Amended Receivership Order.

1.32 "Receiver" means Nancy Gibson, Esq., as the court-appointed receiver for Robinson and not individually, during such time that she is authorized to act in such capacity by order of the AC Court. In the event that the AC Court appoints a successor receiver, "Receiver" shall include such successor receiver during such time as he or she is acting in such capacity.

1.33 "Receivership Order" means the Order Creating Receivership for Robinson Insulation Company entered on or about March 23, 2018 by the AC Court.

1.34 "Robinson" means Robinson Insulation Company, a dissolved corporation.

1.35 "Robinson Entities" means (a) Robinson and its employees, agents, or officers, (b) each of its present and future, direct and indirect, parents, joint ventures, subsidiaries, partners, and affiliates, solely in their capacities as such, (c) each of its past, direct and indirect, parents, joint ventures, subsidiaries, partners, and affiliates, but only if a person or entity described in (a) or (b) above has the power or authority to act on such entity's or person's behalf, (d) any person or entity asserting entitlement to insurance, rights, or benefits under any of the Policies, including any insured, additional insured, named insured, additional named insured, or protected person, but only if an entity or person described in (a) or (b) above has the power or authority to act on such entity or person's behalf, (e) the past, present, and future trustees, administrators, officers, directors, employees, agents, representatives, members, principals, and attorneys of any of the foregoing, but only in their capacities as such, and (f) the predecessors, successors, assigns, heirs, administrators, or executors of any of the foregoing, but solely in their capacities as such.

1.36 "Settlement Amount" means the total of the American States Settlement Amount, the Chubb Settlement Amount, and the Motorists Settlement Amount. Each

- 6 -

Insurer is severally and not jointly liable for the amounts described as that Insurer's Settlement Amount.

1.37 "Settlement Approval Motion" means a motion, to be filed by the Receiver in the AC Court, seeking approval of the Agreement, establishment of a QSF, and entry of the Injunctions.

1.38 "Settlement Approval Order" means a judgment and order entered by the Receivership Court granting the Settlement Approval Motion, approving the Agreement, establishing the QSF, and entering the Injunctions. The Settlement Approval Order shall be substantially in the form attached as Exhibit H hereto, and in all respects shall be subject to the approval of the Insurers, such approval not to be unreasonably withheld or delayed.

1.39 "Trust" means a trust, created pursuant to a trust agreement approved by the AC Court, into which the Settlement Amount held in the QSF will be deposited by the Receiver after the Trust Order has become a Final Order.

1.40 "Trust Order" means an order of the AC Court, on motion of the Receiver, approving establishment of the Trust. The Trust Order shall be in a form reasonably acceptable to all the Parties.

1.41 "Trustee" means the person appointed by the AC Court to serve as trustee of the Trust, including any successor trustees.

2.  Settlement Approval Motion

2.1 Within fifteen business days after the Execution Date, the Receiver shall file the Settlement Approval Motion.

2.2 The Receiver shall provide notice of this Agreement and the Settlement Approval Motion and the deadline for the filing of any objections to the Settlement Approval Motion, and the terms of the proposed Settlement Approval Order, to all known Asbestos Claimants in a form and manner deemed reasonable by the Parties, the goal being to provide comprehensive notice to all Claimants and other persons who might reasonably be expected to be affected by this Agreement so that they have an opportunity to appear and be heard by the AC Court before the Settlement Approval Order is entered.

2.3 The Insurers may, at their own expense, cause notice of the Settlement Approval Motion, including the date, time, and place of the hearing on the Settlement Approval Motion and the deadline for the filing of any objections to the Settlement Approval Motion, to be published in *The Western News, Kalispell Daily Interlake, Sanders County Ledger, Missoulian, Great Falls Tribune, Helena Independent Record, Billings Gazette*, and/or *USA Today* no less than thirty days before the scheduled hearing.

- 7 -

3. <u>Payments</u>.

    3.1    Each Insurer shall pay its respective Settlement Amount by not later than sixty days after satisfaction of all conditions precedent, including the conditions precedent set forth in Section 4.1 below. None of the Insurers shall be responsible for the payment of any other Insurer's Settlement Amount.

    3.2    Each Insurer may pay its respective Settlement Amount by check(s) or wire transfer(s), pursuant to the instructions to be provided by the Receiver at least thirty days before payments of the Insurers' Settlement Amounts are due.

    3.3    Each of the Insurers shall pay its respective Settlement Amount into the QSF. The Receiver or the Trustee, as the case may be, shall not distribute any funds from the QSF except as authorized by the AC Court.

    3.4    The Receiver represents, warrants, and agrees that (a) each Insurer's respective Settlement Amount is the total amount that each Insurer will ever be obligated to pay under or arising out of the Policies to the Receiver, the Robinson Entities, the Grogan Entities, or any other person or entity and (b) the limits of the Policies shall be deemed and declared exhausted. Consistent with the provisions in Section 5 of this Agreement regarding releases, under no circumstances shall any of the Insurers ever be required to make any additional or further payments to any Asbestos Claimant under, or related to, Robinson, Grogan, the Receiver, or any other person or entity under the Policies. The Insurers are not obligated to pay any additional costs to any law firm in connection with legal services rendered to the Receiver or to reimburse the Receiver, Robinson, or Grogan, or any other person or entity at any time for the defense of Asbestos Claims, other than fees incurred by Gordon Rees Scully Mansukhani at the request of any of the Insurers in connection with the defense of Robinson or Grogan against Asbestos Claims or to carry out the terms of this Agreement and the Settlement Approval Order.

    3.5    Each Party reserves to itself the right to allocate the respective Settlement Amounts to such claims or policies as it deems appropriate, and no Party shall be bound by the allocation of any other Party.

4. <u>Conditions Precedent To Insurers' Obligation To Pay Their Respective Settlement Amounts</u>.

    4.1    This Agreement will not be effective, and the Insurers shall have no obligation to pay their respective Settlement Amounts, until each of the following conditions precedent have been satisfied:

        4.1.1    The Settlement Approval Order has been entered and has become a Final Order;

        4.1.2    The AC Court has entered an order placing Grogan Robinson in receivership and appointing Nancy Gibson as Receiver for Grogan;

- 8 -

4.1.3 Counsel at McGarvey, Heberling, Sullivan & Lacey and Odegaard Kovacich Snipes who represent most, if not all, of the Asbestos Claimants must consent in writing to all of the terms of this Agreement.

4.2 If the AC Court, or any other court with jurisdiction, issues a Settlement Approval Order that does not contain all of the provisions described in Sections 8.1 and 8.2 below, this Agreement will, at the option of each Insurer, be voidable, except that the exercise of this option by any Insurer shall not render the Agreement void with . respect to any other Insurer. If any Insurer elects to void this Agreement, the rights, claims, and defenses of all Parties with respect to such electing Insurer are fully preserved as they were immediately prior to the Execution Date.

5. Releases.

5.1 By the Receiver, of the ASI Releasees. Effective immediately upon payment of the American States Settlement Amount, and with no further action being required, the Receiver, on behalf of herself, Robinson, Grogan, and any other entities for whom the Receiver has the power to act, hereby fully, finally, and completely release, settle, and discharge American States and the other ASI Releasees from any and all liability and Claims, past, present, and future, asserted and unasserted, known or unknown, arising out of or relating to any Asbestos Claims, including (a) any obligation under the American States Policies, (b) Claims for bad faith, failure to act in good faith, interest, violation of any duty of good faith or fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, or any other similar type of alleged misconduct or omission, including all "*Ridley*" and "*Dubray*"-type medical and lost wages expense claims, and (c) any and all Claims which are, have been, or could have been asserted against American States in the Coverage Case.

5.2 By the Receiver, of the Chubb Releasees. Effective immediately upon payment of the Chubb Settlement Amount, and with no further action being required, the Receiver, on behalf of herself, Robinson, Grogan, and any other entities for whom the Receiver has the power to act, hereby fully, finally, and completely release, settle, and discharge ACE Fire, ACE P&C, Oakwood Insurance Company (successor by merger to Central National Insurance Company of Omaha, but only with respect to those policies issued through Cravens, Dargan & Company, Pacific Coast), and the other Chubb Releasees from any and all liability and Claims, past, present, and future, asserted and unasserted, known or unknown, arising out of or relating to any Asbestos Claims, including (a) any obligation under the Chubb Policies, (b) Claims for bad faith, failure to act in good faith, interest, violation of any duty of good faith or fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, or any other similar type of alleged misconduct or omission, including all "*Ridley*" and "*Dubray*"-type medical and lost wages expense claims, and (c) any and all Claims which are, have been, or could have been asserted against ACE Fire or ACE P&C in the Coverage Case.

- 9 -

Exhibit B009

5.3 <u>By the Receiver, of the Motorists Releasees</u>. Effective immediately upon payment of the Motorists Settlement Amount, and with no further action being required, the Receiver, on behalf of herself, Robinson, Grogan, and any other entities for whom the Receiver has the power to act, hereby fully, finally, and completely release, settle, and discharge Motorists and the other Motorists Releasees from any and all liability and Claims, past, present, and future, asserted and unasserted, known or unknown, arising out of or relating to any Asbestos Claims, including (a) any obligation under the Motorists Policies, (b) Claims for bad faith, failure to act in good faith, interest, violation of any duty of good faith or fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, or any other similar type of alleged misconduct or omission, including all "*Ridley*" and "*Dubray*"-type medical and lost wages expense claims, and (c) any and all Claims which are, have been, or could have been asserted against Motorists in the Coverage Case.

5.4 <u>By Each Insurer, of the Receiver, the Robinson Entities, and the Grogan Entities</u>. Effective immediately upon each Insurer's payment of its respective Settlement Amount, and with no further action being required, such Insurer hereby fully, finally, and completely releases, settles, and discharges the Receiver, the Robinson Entities, and the Grogan Entities from any and all liability and Claims, past, present, and future, asserted and unasserted, known or unknown, arising out of or relating to (a) any Claims under the released Insurer's Policies or any associated agreements to pay any chargebacks, deductibles, premiums, retrospective premiums, and/or self-insurance assessments for Released Matters, (b) any Claims for payment of defense costs, (c) Claims for bad faith, failure to act in good faith, interest, violation of any duty of good faith or fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, or any other similar type of alleged misconduct or omission, and (d) any and all Claims which are, have been, or could have been asserted against the Receiver in the Coverage Case.

5.5 <u>By Each Insurer, of the other Insurers</u>. Effective immediately upon each Insurer's payment of its respective Settlement Amount, and with no further action being required, the other Insurers hereby fully, finally, and completely release, settle, and discharge the Insurer paying its respective Settlement Amount from any and all liability and Claims, past, present, and future, asserted and unasserted, known or unknown, arising out of or relating to (a) any obligation under the paying Insurer's respective Policies, (b) Claims for bad faith, failure to act in good faith, interest, violation of any duty of good faith or fair dealing, violation of any unfair claims practices act or similar statute, regulation, or code, or any other similar type of alleged misconduct or omission, including all Contribution Claims and all "*Ridley*" and "*Dubray*"-type medical and lost wages expense claims, and (c) any and all Claims which are, have been, or could have been asserted against the paying Insurer in the Coverage Case. Notwithstanding the foregoing, nothing in this Agreement releases any claims by one Insurer against another Insurer in its role as reinsurer or retrocessionaires.

5.6 The Releases described in Sections 5.1 through 5.5 above shall not release the Parties' rights to enforce the terms of this Agreement following entry of the Settlement Approval Order by the AC Court, all of which rights shall be expressly reserved by the Parties.

5.7 Immediately upon payment by each Insurer of its respective Settlement Amount, and with no further action being required, such paying Insurer shall be deemed to have bought back all of its respective Policies free and clear of interests, which shall extinguish all obligations that such Insurer has, had, or ever could have to the Receiver, the Robinson Entities, the Grogan Entities, or any other person or entity for insurance coverage under its respective Policies.

5.8 Each Insurer agrees to not pursue any Contribution Claim against any other Insurer or against other insurers of Robinson or Grogan; *provided*, however, that (a) if an insurer other than one of the Insurers pursues such claims against any Insurer, that Insurer may defend against such claim and may also pursue against such insurer all Contribution Claims such Insurer has against the insurer pursuing such claims; and (b) each Insurer shall retain all rights to pursue reinsurance recoveries with respect to its payment of its respective Settlement Amount.

5.9 The Parties expressly represent and warrant that they are familiar with California Civil Code § 1542 and that the effect and import of that provision has been fully explained and that, after consultation with their attorneys, the Parties expressly waive the provisions of California Civil Code § 1542, and other state and federal statutes of similar effect. California Civil Code § 1542 provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

5.10 No portion of the Settlement Amount shall be disbursed to an Asbestos Claimant unless that Asbestos Claimant first executes and delivers to the Receiver (or the Trustee, if the Trust has been established), a written release of all Claims of such Asbestos Claimant arising under or related to the Policies against (a) the Insurer Parties and (b) the Receiver, the Trustee and the Trust, the Robinson Entities, and the Grogan Entities. The Receiver and the Insurers shall agree to the form of the release, or, in the absence of agreement, the release shall be in a form which wholly releases the Insurer Parties and is approved by the AC Court.

6. <u>Cessation of Litigation in the AC Court</u>.

6.1 Each Insurer agrees that, within five business days after being advised by the Receiver that the Settlement Approval Order has become a Final Order, it will (a) withdraw any and all motions, briefs, pleadings, and objections it has made in the

- 11 -

AC Court and any request for relief from or against the Receiver will be deemed withdrawn, and (b) not pursue any Claims against the Receiver in the AC Court or that are being released pursuant to this Agreement.

6.2 From the Execution Date until the date the Settlement Approval Order has become a Final Order, each Party shall file no new motions, briefs, pleadings, claims, objections, or other requests for relief against any other Party in the AC Court.

6.3 The Insurers and the Receiver shall bear their own fees and expenses in connection with any proceedings in the AC Court.

7. Cessation of Litigation in the Coverage Case.

7.1 The Parties agree that, within five business days after being advised by the Receiver that the Settlement Approval Order has become a Final Order, they will file in the Coverage Case a stipulation of dismissal with prejudice of all Claims (including the complaint, all counterclaims, and all cross-claims) that each Party has asserted against any other Party, with all Parties to bear their own fees and expenses. The stipulation shall be substantially in the form set forth as Exhibit G hereto.

7.2 From the Execution Date until the date the Settlement Approval Order has become a Final Order, the Parties agree that they shall file no new motions, briefs, pleadings, objections, or other requests for relief against each other in the Coverage Case and will provide open extensions of time for each other, as may be necessary to avoid unnecessary litigation expenses.

7.3 The Insurers and the Receiver shall bear their own fees and expenses in connection with any proceedings in the Coverage Case.

8. Injunction, Bar Order, Judgment Reduction, and Indemnification.

8.1 The Settlement Approval Order must include the entry of an injunction barring all Claims against the Insurers released by the Receiver pursuant to Sections 5.1, 5.2, and 5.3 of this Agreement. The injunction shall state, in substance, as follows: "Pursuant to the Court's inherent equitable authority, (a) all Persons who hold or assert, or may in the future hold or assert, any Claim against Robinson, Grogan, or the Receiver arising in connection with the activities covered by the Policies, or in connection with the activities of Robinson or Grogan giving rise to the Claims that have been made or that could be made under the Policies, and (b) all Persons who may claim to be an insured, additional insured, or otherwise entitled to any benefit under the Policies, are permanently stayed, barred, restrained, and enjoined from asserting any such Claim or right to entitlement, from commencing a proceeding, or taking any other action against ACE Fire Underwriters Insurance Company, ACE Property & Casualty Insurance Company, Oakwood Insurance Company (successor by merger to Central National Insurance Company of Omaha, but only with respect to those policies issued through Cravens, Dargan & Company, Pacific

- 12 -

Coast), Motorists Commercial Mutual Insurance Company, or American States Insurance Company (collectively, the 'Settling Insurers') or the persons and entities defined in the Agreement as 'Insurer Parties' for the purpose of obtaining any recovery or other relief from the Settling Insurers or the Insurer Parties based on, under, arising out of, related or attributable to, and/or in connection with the Policies."

8.2     The Settlement Approval Order must also include a contribution bar order stating, in substance, as follows: "All claims for contribution, allocation, subrogation, and equitable indemnity, or similar claims, against any of the Settling Insurers (collectively, 'Contribution Claims'), whether by parties appearing before the Asbestos Claims Court or not, are hereby BARRED pursuant to the Court's inherent equitable authority. All Contribution Claims against any of the Settling Insurers shall be channeled to the QSF established to hold the Settlement Amounts paid by the Settling Insurers or to any Trust to which the funds in the QSF are transferred following an order by this Court authorizing such transfer."

8.3     In the event that any other insurer of Robinson or Grogan or any other Person obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from any of the Insurers as a result of a Contribution Claim against any Insurer for the alleged share or equitable share of such Insurer for defense costs or indemnity costs relating to Claims against the Receiver, Robinson, or Grogan, the Receiver or the Trustee, as the case may be, shall voluntarily reduce such judgment(s) or Claim(s) against, or settlement with, such other insurer(s) or persons to the extent necessary to eliminate such Contribution Claims against the Insurer. To ensure that such a reduction is accomplished, each Insurer shall be entitled to assert this section as a complete defense to any action against it for any such portion of the judgment or Claim and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Insurer from any liability for the judgment or Claim, the goal being to ensure that the Insurer does not pay anything more than its respective Settlement Amount with respect to matters encompassed within the releases set forth in Sections 5.1 through 5.3 of this Agreement.

8.4     The Receiver or the Trustee, as the case may be, will attempt to minimize the possibility of Contribution Claims being made against any of the Insurers by any person or entity with respect to insurance coverage for Claims against Robinson or Grogan by using reasonable best efforts to obtain from each other person or entity settling with the Receiver an agreement to waive or release any and all Contribution Claims it may have against the Insurers and not to otherwise proceed against the Insurers

8.5     The Receiver shall indemnify each of the Insurers against all Claims filed by other insurers, up to the amount of each Insurer's respective Settlement Amount, to the extent necessary given the judgment reduction provision set forth in Section 8.3 of this Agreement. The Receiver may use funds from the QSF for purposes of

- 13 -

fulfilling her indemnification obligations. The Receiver's indemnification obligations shall be assumed by the Trustee upon the establishment of the Trust, and the Trustee may use funds from the Trust for purposes of fulfilling such indemnification obligations.

8.6 The Receiver or the Trustee, as the case may be, shall cooperate with the Insurers in any litigation against the Insurers asserting any Contribution Claims with respect to any liability under the Policies that is released under this Agreement. Without limiting the foregoing, the Receiver or the Trustee, as the case may be, shall support arguments made by the Insurers that their obligations with respect to such claims have been fully released, satisfied, and extinguished by this settlement.

9. Confidentiality

9.1 The Parties may notify the AC Court of the fact of their settlement-in-principle, but shall otherwise maintain the terms of their settlement-in-principle as strictly confidential with respect to third parties until such time as the Receiver files the Settlement Approval Motion. The Parties agree that the Receiver may file this Agreement in the public record with the AC Court in connection with the Settlement Approval Motion.

9.2 Nothing herein shall limit the Insurers' right, prior to or after filing of the Settlement Approval Motion, to fully and completely advise their reinsurers and retrocessionaires as to all matters related to the settlement-in-principle, including but not limited to the terms and conditions of this Agreement and any related documents.

9.3 Notwithstanding any other provision in this Agreement, the Parties agree that this Agreement and any related documents, may be disclosed to counsel at McGarvey, Heberling, Sullivan & Lacey and Odegaard Kovacich Snipes who represent most, if not all, of the Asbestos Claimants, for purposes of seeking and obtaining their consent, provided that prior to any such disclosure, such Asbestos Claimants' counsel agree in writing to maintain any information relating to the settlement-in-principle as strictly confidential.

10. Bankruptcy

10.1 In the event that Robinson and/or Grogan becomes the subject of any proceedings pursuant to the United States Bankruptcy Code (a "Restructuring Filing") before all of the Insurers have paid their Settlement Amounts, the Parties agree and acknowledge that:

10.1.1 This Agreement, having been negotiated at arm's length in settlement of bona fide disputes and supported by adequate consideration, is not a preference under section 547 of the Bankruptcy Code, a fraudulent conveyance under sections 546 or 548 of the Bankruptcy Code, or

- 14 -

avoidable under any other applicable federal bankruptcy or non-bankruptcy law.

10.1.2 The Parties will cooperate to preserve the validity, finality, and enforceability of this Agreement. The Receiver, the Trustee, Robinson, and Grogan shall use their respective best efforts to oppose any and all efforts to challenge this Agreement under any provision of the Bankruptcy Code or state law.

10.1.3 In any Restructuring Filing where the Receiver, the Trustee, Robinson, or Grogan seeks to discharge Asbestos Claims, the Receiver, the Trustee, Robinson, and/or Grogan shall request and use their best efforts to obtain, from the Bankruptcy Court and/or the District Court, a permanent injunction pursuant to 11 U.S.C. §§ 524(g) and/or 105(a) that enjoins all persons from commencing or continuing any action, proceeding or Claim, including any Asbestos Claim, against the Insurers, directly or indirectly, to collect, recover, or receive payments, satisfaction, or recovery of any kind under, relating to, or arising out of Asbestos Claims and/or the Policies.

10.1.4 The releases contained herein are fully effective according to their terms and this Agreement is not an executory contract.

11. Assignment and Authority.

11.1 The Receiver and the Insurers each separately represent and warrant that they have not waived, released, assigned, or transferred any right, title, or interest in the Policies.

11.2 Each Party represents and warrants that the individual executing this Agreement on its behalf has the authority to do so and to bind that Party to the obligations set forth herein. Each Party represents and warrants that it has authority to execute this Agreement as its binding and legal obligation. Each Party represents and warrants that it has read this Agreement in full and that the person signing this Agreement on its behalf is authorized by those they purport to represent to execute this Agreement and to bind that Party to the obligations set forth in this Agreement in full.

12. Non-Prejudice and Construction of Agreement.

12.1 This Agreement is a negotiated compromise of disputed issues among the Parties, bargained for and entered into in good faith and as the result of arm's-length negotiations, and at all times material the Parties have been represented by counsel of their own choosing concerning the rights affected by this Agreement, the form and content of it, and the advisability of executing it. This Agreement shall not be construed as an admission relating to or in any way connected with the Policies or the Claims or defenses asserted in the Coverage Case, nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the

- 15 -

positions of the Parties with respect to the interpretation and application of the Policies. No communications or statements made during the negotiations of this Agreement shall be discoverable or admissible in any dispute between the Parties to enforce the terms of the Agreement.

12.2 This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect the Parties' views as to their rights and obligations with respect to matters or entities outside the scope of this Agreement. The Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement except as expressly set forth herein.

12.3 The Parties have participated jointly in the negotiation, drafting, and preparation of this Agreement, and agree that, in the event an ambiguity or question of intent or interpretation arises related to this Agreement, this Agreement shall be construed as if drafted jointly by the Parties hereto. Accordingly, no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement or by virtue of any Party's status as an insurance company.

12.4 Subject to Section 4.2 of this Agreement, in the event that any portion of this Agreement should for any reason become or be found by a court or other tribunal to be null, void, illegal, invalid, or otherwise unenforceable, the remaining portions of this Agreement shall remain in full force and effect and continue to be binding on the Parties provided that each Party continues to receive substantially the benefit of its bargain hereunder

12.5 This Agreement is not, nor shall it be construed as, an insurance policy.

13. Governing Law.

13.1 This Agreement shall be governed by and shall be construed in accordance with the law of the State of Montana without regard to its conflict of law principles.

14. Notices.

14.1 Unless another person is designated, in writing, for receipt of notices hereunder, all notices to the respective Parties shall be sent to the following persons:

American States:          Terri Yahia
                          Assistant Vice President and Associate General Counsel
                          Resolute Management Inc.
                          125 High Street, 10th Floor
                          Boston, Massachusetts  02110
                          tyahia@resolutemgmt.com

- 16 -

| with a copy to: | Michael J. Cohen, Esq. |
| | Meissner Tierney Fisher & Nichols S.C. |
| | 111 East Kilbourn Avenue, 19th Floor |
| | Milwaukee, Wisconsin 53202 |
| | E-mail: mjc@mtfn.com |

| Chubb: | Tamika Jones |
| | Assistant Vice President – Claims |
| | Brandywine Group of Insurance & Reinsurance Companies |
| | 510 Walnut Street – WB11E |
| | Philadelphia, PA 19106 |
| | E-mail: tamika.jones@brandywineholdings.com |

| with a copy to: | Mark D. Plevin |
| | Crowell & Moring LLP |
| | Three Embarcadero Center, 26th Floor |
| | San Francisco, CA 94111 |
| | E-mail: mplevin@crowell.com |

| Motorists: | H. Toney Stroud, Esq. |
| | Encova Insurance |
| | P.O. Box 3922 |
| | Charleston, West Virginia 25339 |
| | E-mail: toney.stroud@encova.com |

| with a copy to: | Marc Weintraub, Esq. |
| | Bailey & Glasser LLP |
| | 360 Central Avenue |
| | Suite 1500 |
| | St. Petersburg, Florida 33701 |
| | E-mail: mweintraub@baileyglasser.com |

| Receiver: | Nancy Gibson, Esq. |
| | Gibson Law Offices PLLC |
| | 4110 Weeping Willow Drive |
| | Missoula, Montana 59803 |

| with a copy to: | Allan McGarvey, Esq. |
| | McGarvey Heberling Sullivan & Lacey |
| | 345 First Avenue East |
| | Kalispell, Montana 59901 |
| | E-mail: amcgarvey@mcgarveylaw.com |

14.2    Any Party may change the address at which communications are to be delivered to

- 17 -

Exhibit B017

it by giving notice to the others, in the manner provided in this Section 14.

15. <u>Medicare and Other Third-Party Claims</u>.

15.1 The Parties agree that, given the buy-back nature of this settlement, to the extent any obligation under 42 USC § 1395y, *et seq.*, commonly referred to as the Medicare, Medicaid, and SCHIP Extension Act of 2007, or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto (including 42 CFR §§ 411, *et seq.*), with respect to any Asbestos Claims (collectively, the "MSP") is triggered in connection with the Settlement Amount, the Receiver agrees that she is the Responsible Reporting Entity ("RRE").

15.1.1 The Parties agree that all duties and obligations of the Receiver under Section 15 of this Agreement may be assigned to and assumed by the Trustee pursuant to the Trust Order after (a) the Trust Order has become a Final Order, (b) the Trustee has agreed in a writing sent to all Parties that he or she will assume all duties, obligations, and agreements of the Receiver under Section 15 of this Agreement, and (c) the Settlement Amount has been transferred by the Receiver from the QSF to the Trust.

15.2 The Parties further agree that the Insurers are not subject to any reporting requirements or obligations under the MSP. The Parties nevertheless agree to the reporting provisions set forth in Sections 15.3 through 15.12 of this Agreement to ensure full compliance with the MSP.

15.3 The Receiver and/or the Trust, as the case may be, is the RRE and shall assume the obligations of an RRE for all Claims paid with the proceeds of the Settlement Amount.

15.4 The RRE shall, at its sole expense, timely submit all reports that are required by a Responsible Reporting Entity under the reporting provisions of Section III of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173) or any other similar statute or regulation ("MMSEA") on account of Asbestos Claims paid by the RRE. The RRE or its RRE Agent shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing or receiving reports under MMSEA (collectively, "CMS") to determine whether or not and, if so, how to report to CMS pursuant to MMSEA.

15.5 The RRE Agent shall provide a written notification to the Insurers within ten business days following receipt of any notification from CMS that any report by the RRE was rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance.

- 18 -

Exhibit B018

15.5.1 With respect to any reports rejected or otherwise identified as noncompliant by CMS, the RRE Agent shall, at the request of any of the Insurers, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports. The RRE Agent shall reasonably undertake to remedy any issues of noncompliance that CMS identifies and to resubmit such reports to CMS. Upon request by any of the Insurers, the RRE Agent shall provide the Insurers with copies of such resubmissions. With respect to copies of original reports and resubmissions provided under this Section 15.5.1, the RRE Agent may redact from such copies the names, social security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators, and/or other personal representatives, as applicable.

15.5.2. All documentation that the RRE Agent relies upon in making a determination that a payment does not have to be reported to CMS shall be maintained for a minimum of six years following such determination.

15.6 The Receiver and/or the Trustee, as the case may be, is not required by this Agreement to make report any that is not required by MMSEA.

15.7 The Parties recognize that, upon the completion of her responsibilities, the AC Court may discharge the Receiver from any further obligations with respect to Robinson or Grogan. Likewise, the Parties recognize that once the Trust's purposes are completed, or upon the appointment of a successor trustee, the AC Court may discharge the Trustee from any further obligations with respect to the Trust. Nothing in this Agreement will impose any duty on any individual, including Nancy Gibson, in any individual capacity or constitute a basis to extend Ms. Gibson's role as Receiver. To ensure the preservation of any information that the Insurers may need in the event CMS concludes that reporting done by the RRE in accordance with the above provisions within this Section 15 is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the RRE or the Insurers a concern with respect to the sufficiency or timeliness of such reporting or non-reporting, to satisfy any reporting obligation under any MSP, within thirty calendar days after the Execution Date, any of the Insurers shall provide to the Receiver a list of the information that such Insurer designates as likely to be necessary for that Insurer to respond to any notice by CMS that the RRE's reporting was deficient. Subject to AC Court approval, the Receiver and/or the Trustee, as the case may be, shall collect that information from Asbestos Claimants as part of any claim submission procedures. Following the end of the Trustee's responsibilities, the Insurers, at their own expense, shall be entitled to maintain and access this information exclusively to address any claim of non-compliance by the RRE or the RRE Agent with MSP reporting obligations, subject to appropriate confidentiality standards

- 19 -

Exhibit B019

approved by the AC Court. At the Insurers' reasonable request, the Receiver and/or the Trustee, as the case may be, will meet and confer with the Insurers prior to terminating her duties to ensure a transition of any information per this paragraph.

15.8 The RRE and/or any RRE Agent shall indemnify and hold the Insurers harmless from any and all fines, penalties, claims, demands, liens, subrogated interests, and causes of action of any nature or character that may in the future be asserted by Medicare and/or persons or entities acting on behalf of Medicare in respect of Medicare claims reporting and payment obligations in connection with the Asbestos Claims, including any obligations owing or potentially owing under MMSEA or 42 U.S.C. § 1395y(b) or any related rules, regulations, or guidance issued in connection therewith, or relating thereto, and any claims arising from or related to the RRE Agent's obligations under this Section 15.

15.9 The Receiver and/or the Trustee, as the case may be, shall obtain, prior to remittance of funds to Asbestos Claimants' counsel or the claimant, if pro se, in respect of any Asbestos Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Asbestos Claim. The Receiver and/or the Trustee, as the case may be, shall provide a certification of his or her compliance with this Section to the Insurers upon the Insurers' request, but not more often than quarterly. The Receiver and/or the Trustee, as the case may be, shall permit reasonable audits by the Insurers, no more often than quarterly, to confirm compliance with this Section 15. The Insurers shall keep any information and documents received from the Receiver or the Trustee pursuant to this Section 16 confidential and shall not use such information for any purpose other than meeting obligations under this Section 15.

15.10 Compliance with the requirements of Sections 15.1 through 15.9 of this Agreement shall be a material obligation of the Receiver and/or the Trustee in favor of the Insurers.

15.11 The Parties agree that Sections 15.2 through 15.10 of this Agreement are intended to be purely prophylactic in nature, and shall not constitute or be construed as an admission that the Insurers are in fact an "applicable plan" for MSP reporting purposes, or that they have any legal obligation to report any actions undertaken by the Receiver, the Trustee, or other payor of Asbestos Claims under the MSP or any other statute or regulation.

15.12 Assets held by the Receiver, the Trustee, or other entity responsible for paying Asbestos Claims may also be used for payment of indemnity and expenses relating to reimbursing conditional payments made pursuant to the MSP to applicable Medicare beneficiaries. Except for the payment of amounts payable under this Agreement, no Party shall be obligated to make any payments for this purpose.

- 20 -

16. Dispute Resolution.

16.1 If any dispute should arise concerning the terms, meaning, or implementation of this Agreement, the Parties agree to use their best efforts to reach a prompt resolution of such dispute. If the Parties are unable to reach an agreement, they shall proceed to mediation within thirty days after either Party delivers a written notice of request for mediation. If the mediation is unsuccessful, either Party may commence a legal action in an appropriate forum, but no Party may initiate litigation until after a mediation has commenced and the mediator has determined that the Parties' mediation has reached an impasse.

17. Miscellaneous Provisions.

17.1 This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and to their respective successors.

17.2 This Agreement is not intended to benefit any person or entity other than the Parties, the ASI Releasees, the Chubb Releasees, and the Motorists Releasees, except as expressly stated herein. Other than as expressly provided herein, this Agreement is not intended to bind any non-Party to any of the compromises, stipulations or agreements made herein.

17.3 Each Party warrants and represents that neither it nor any of its predecessors, affiliates, agencies, departments, organizations, branches, commissions, or divisions has previously assigned or transferred or executed an agreement purporting to assign or transfer (a) any Claim released or waived herein or (b) any rights or obligations under this Agreement.

17.4 This Agreement is not assignable by any Party and any purported assignment shall be void without the express written agreement of the other Parties, except an assignment by operation of law which shall be effective.

17.5 In the event that any non-Party to this Agreement takes any action to try to invalidate this Agreement in whole or in part, the Parties will fully cooperate to oppose such action.

17.6 The titles of the sections in this Agreement are for convenience of reference only and are not intended to be part of, or to affect the meaning, construction, or interpretation of, this Agreement.

17.7 This Agreement contains the entire agreement among the Parties with respect to the issues addressed herein. Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms. Any statements, promises, or

- 21 -

inducements made by either Party or any agent of either Party that are not contained in this Agreement shall not be valid or binding.

17.8    This Agreement may be executed in several counterparts, each of which shall be deemed an original, which together shall constitute one and the same instrument and agreement. Each counterpart may be delivered by electronic transmission (by facsimile or e-mail as a .pdf attachment), and a faxed or e-mailed signature shall be binding with the same force and effect as original signatures.

17.9    Each of the Parties represents and warrants that it is authorized to enter into this Agreement; that the execution and delivery of this Agreement and the consummation of this transaction will not conflict with or result in any violation or default under any provision of its articles of incorporation, charter, by-laws, or partnership agreement or of any decree, statute, law, ordinance, rule, or regulation applicable to it; and that no further consent, approval, order, authorization, or filing with any governmental authority is required in connection with the execution and delivery of this Agreement or the consummation of the transactions described in this Agreement.

17.10   Each signatory of this Agreement declares, warrants, and represents that he or she has the general and specific authority to enter into and to execute this Agreement. This Agreement may be executed on behalf of any Party by the Party's attorney with the same force and effect as if the Party had personally executed the Agreement.

17.11   Each Party understands, acknowledges, and agrees that if any fact or legal premise now believed to be true is found hereafter to be other than, or different from, that which is now believed, each expressly assumes the risk of such difference in fact or legal premise and agrees that this Agreement shall and will remain effective notwithstanding any such difference.

17.12   This Agreement shall not be modified, altered, or discharged, nor any of its provisions waived, except by a writing signed by each of the Parties hereto. A failure to enforce any provision of this Agreement in a particular instance shall not be construed as a waiver of any such provision or any other provision of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

Nancy Gibson, Receiver


By: _____ Dated: May ___, 2020
    Nancy Gibson
    Receiver of Robinson Insulation Company

- 22 -

Exhibit B022

American States Insurance Company,
by its authorized claims representative,
Resolute Management, Inc.

By: _____ Dated: May ___, 2020
    Melissa Arkwell
    Senior Vice President Direct Claims

ACE Fire Underwriters Insurance Company
and ACE Property & Casualty Insurance Company

By: _____ Dated: May ___, 2020
    Shelby L. Mattioli
    Senior Vice President, Brandywine Direct Claims

Motorists Commercial Mutual Insurance Company

By: _____ Dated: May ___, 2020
    William J. McGee, Jr.
    Senior Vice President, Chief Risk Officer
    Encova Insurance (formerly Motorists Insurance Group
    and BrickStreet Insurance)

Exhibit B023

## EXHIBIT A – KNOWN AMERICAN STATES POLICY ISSUED TO ROBINSON

| ISSUING INSURER | POLICY | POLICY PERIOD |
|---|---|---|
| American States Insurance Company | AP 079-570-1 | 5/28/85-5/28/86 |

Exhibit B024

## EXHIBIT B – KNOWN CHUBB POLICIES ISSUED TO ROBINSON

| ISSUING INSURER | POLICY | POLICY PERIOD |
|---|---|---|
| Central National Insurance Company of Omaha | CNU 035051 (umbrella) | 4/11/80 to 2/11/81 |
| Central National Insurance Company of Omaha | CNU 004833 (umbrella) | 2/11/81 to 2/11/84 (cancelled effective 2/11/83) |
| Aetna Fire | WDP DO 7818105 (primary) | 2/10/83 to 2/10/84 |
| Aetna Ins. Co. | UL 850829 (umbrella) | 2/10/83 to 2/10/84 |
| Aetna Fire | RWP DO 7818105 (primary) | 2/10/84 to 2/10/85 |

# EXHIBIT C – KNOWN OR ALLEGED MOTORISTS POLICIES ISSUED OR ALLEGEDLY ISSUED BY AMERICAN HARDWARE MUTUAL INSURANCE COMPANY TO ROBINSON

## Primary Policies

| POLICY | POLICY PERIOD | MOTORISTS' DISPUTE |
|--------|---------------|--------------------|
| 1-2282065 | 12/20/1971-12/20/1974 | Interpretation of aggregate limit of liability; Motorists' position is it is a policy period aggregate |
| 2-2282514 | 02/10/1972-02/10/1975 | Interpretation of aggregate limit of liability; Motorists' position is it is a policy period aggregate |
| 5-2282514 | 02/10/1975-02/10/1978 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 4-2282514 | 02/10/1978-02/10/1979 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 8-2282514 | 02/10/1978-02/10/1979 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 9-2282514 | 02/10/1979-02/10/1980 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 5-5573921 | 03/15/1985-05/10/1985 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| Unknown | 1973-1978 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 5-5572332 | Unknown | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |

## Umbrella Policies

| POLICY | POLICY PERIOD | MOTORISTS' DISPUTE |
|--------|---------------|--------------------|
| 1-2140381 | 12/20/1971-02/10/1972 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 2-2140381 | 02/10/1972-02/10/1973 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 3-2140381 | 02/10/1973-02/10/1974 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 4-2140381 | 12/26/1974-12/26/1977 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 7-2140381 | 12/26/1977-12/26/1978 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 8-2142864 | 12/26/1978-12/26/1979 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| 9-2142864 | 12/26/1979-4/11/1980 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |
| Unknown | 3/15/1985-5/10/1985 | Existence of this policy and extent of coverage due to (i) lack of information on coverage and policy terms, and (ii) lack of information regarding claimant exposure during the period |

Except for the policies listed above, Motorists disputes the existence of any other policies of liability insurance, whether known or unknown, whether issued or allegedly issued, whether primary, umbrella, excess, or otherwise, issued or allegedly issued prior to the Execution Date by any entity with the definition of Motorists Releasees: (a) to any entity or person within the definition of Robinson or Grogan; or (b) under which any entity or person within the definition of Robinson Entities or Grogan Entities, or any of their respective successors or assigns, contends that Robinson, Grogan, or the Receiver are entitled to insurance, rights, benefits, or otherwise.

# EXHIBIT D – AMERICAN STATES ENTITIES TO BE RELEASED

| | |
|---|---|
| America First Insurance Company | America First Lloyd's Insurance Company |
| American Economy Insurance Company | American Fire and Casualty Company |
| American States Insurance Company | American States Insurance Company of Texas |
| American States Lloyds Insurance Company | American States Preferred Insurance Company |
| Colorado Casualty Insurance Company | Consolidated Insurance Company |
| Employers Insurance Company of Wausau | Excelsior Insurance Company |
| The First Liberty Insurance Corporation | First National Insurance Company of America |
| General Insurance Company of America | Golden Eagle Insurance Corporation |
| Hawkeye-Security Insurance Company | Indiana Insurance Company |
| Insurance Company of Illinois | Ironshore Indemnity Inc. |
| Ironshore Specialty Insurance Company | Liberty County Mutual Insurance Company |
| Liberty Insurance Corporation | Liberty Insurance Underwriters Inc. |
| Liberty Lloyds of Texas Insurance Company | Liberty Mutual Fire Insurance Company |
| Liberty Mutual Insurance Company | Liberty Mutual Mid-Atlantic Insurance Company |
| Liberty Mutual Personal Insurance Company | Liberty Northwest Insurance Corporation |
| Liberty Personal Insurance Company | Liberty Surplus Insurance Corporation |
| LM General Insurance Company | LM Insurance Corporation |
| LM Property and Casualty Insurance Company | Mid-American Fire & Casualty Company |
| The Midwestern Indemnity Company | Montgomery Mutual Insurance Company |
| National Insurance Association | The Netherlands Insurance Company |
| North Pacific Insurance Company | The Ohio Casualty Insurance Company |

Ohio Security Insurance Company

Oregon Automobile Insurance Company

Peerless Indemnity Insurance Company

Peerless Insurance Company

Safeco Insurance Company of America

Safeco Insurance Company of Illinois

Safeco Insurance Company of Indiana

Safeco Insurance Company of Oregon

Safeco Lloyds Insurance Company

Safeco National Insurance Company

Safeco Surplus Lines Insurance Company

San Diego Insurance Company

Wausau Business Insurance Company

Wausau Underwriters Insurance Company

Wausau General Insurance Company

West American Insurance Company

## EXHIBIT E – CHUBB ENTITIES TO BE RELEASED

| |
|---|
| ACE American Insurance Company, formerly known as CIGNA Insurance Company formerly known as INA Underwriters, formerly known as Allied Insurance Company |
| ACE American Insurance Company, successor to ACE American Lloyds Insurance Company fka ACE American Insurance Company of Texas fka American Lloyds Insurance Company |
| ACE American Insurance Company, successor to ACE American Lloyds Insurance Company fka ACE American Insurance Company of Texas fka American Lloyds Insurance Company |
| ACE American Reinsurance Company, formerly known as CIGNA Reinsurance Company, formerly known as INA Reinsurance Company |
| ACE Employers Insurance Company, formerly known as CIGNA Employers Insurance Company, formerly known as INA Employers Insurance Company |
| ACE Fire Underwriters Insurance Company, formerly known as CIGNA Fire Underwriters Insurance Company, formerly known as Aetna Fire Underwriters Insurance Company |
| Westchester Fire Insurance Company, successor to ACE Indemnity Insurance Company, formerly known as CIGNA Indemnity Insurance Company |
| ACE American Insurance Company, successor to ACE Insurance Company of Illinois, formerly known as CIGNA Insurance Company of Illinois, formerly known as INA Insurance Company of Illinois |
| ACE American Insurance Company, successor to ACE Insurance Company of Ohio, formerly known as CIGNA Insurance Company of Ohio, formerly known as Aetna Insurance Company of Ohio |
| Chubb Insurance Company of Puerto Rico, formally known as ACE Insurance Company of Puerto Rico, formerly known as CIGNA Insurance Company of Puerto Rico, formerly known as Aetna Insurance Company of Puerto Rico |
| ACE American Insurance Company, successor to ACE Insurance Company of Texas, formerly known as CIGNA Insurance Company of Texas, formerly known as Aetna Insurance Company of Texas |
| ACE Insurance Company of the Midwest, successor to CIGNA Insurance Company of the Midwest, formerly known as Aetna Insurance Company of the Midwest |
| ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Company, successor to Aetna Insurance Company |

| |
|---|
| ACE Fire Underwriters Insurance Company, formerly known as CIGNA Fire Underwriters Insurance Company, formerly known as Aetna Fire Underwriters Insurance Company |
| ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Company, successor to Aetna Insurance Company |
| ACE American Insurance Company, successor to ACE Insurance Company of Ohio, formerly known as CIGNA Insurance Company of Ohio, formerly known as Aetna Insurance Company of Ohio |
| Chubb Insurance Company of Puerto Rico, formerly known as ACE Insurance Company of Puerto Rico, formerly known as CIGNA Insurance Company of Puerto Rico, formerly known as Aetna Insurance Company of Puerto Rico |
| ACE American Insurance Company, successor to ACE Insurance Company of Texas, formerly known as CIGNA Insurance Company of Texas, formerly known as Aetna Insurance Company of Texas |
| ACE Insurance Company of the Midwest, formerly known as CIGNA Insurance Company of the Midwest, formerly known as Aetna Insurance Company of the Midwest |
| Aetna Insurance Company of Connecticut |
| Allied Insurance Company |
| ACE American Insurance Company, successor to ACE American Lloyds Insurance Company fka ACE American Insurance Company of Texas fka American Lloyds Insurance Company |
| Atlantic Employers Insurance Company |
| Bankers Standard Insurance Company, successor to Bankers Standard Fire & Marine Company |
| Bankers Standard Insurance Company |
| Central National Insurance Company of Omaha, but only as respects policies issued through Cravens, Dargan & Company, Pacific Coast |
| Century Indemnity Company, including as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company |
| Century Reinsurance Company |
| Chubb Custom Insurance Company |
| Chubb Indemnity Insurance Company |

| |
|---|
| Chubb Insurance Company of New Jersey |
| Chubb Insurance Company of Puerto Rico, formerly known as ACE Insurance Company of Puerto Rico, formerly known as CIGNA Insurance Company of Puerto Rico, formerly known as Aetna Insurance Company of Puerto Rico |
| Chubb Lloyd's Insurance Company of Texas |
| Chubb National Insurance Company |
| ACE Employers Insurance Company, formerly known as CIGNA Employers Insurance Company, formerly known as INA Employers Insurance Company |
| ACE Fire Underwriters Insurance Company, formerly known as CIGNA Fire Underwriters Insurance Company, formerly known as Aetna Fire Underwriters Insurance Company |
| Westchester Fire Insurance Company, successor to ACE Indemnity Insurance Company, formerly known as CIGNA Indemnity Insurance Company |
| ACE American Insurance Company, formerly known as CIGNA Insurance Company successor to INA Underwriters, formerly known as Allied Insurance Company |
| ACE American Insurance Company, successor to ACE Insurance Company of Illinois, formerly known as CIGNA Insurance Company of Illinois, formerly known as INA Insurance Company of Illinois |
| ACE American Insurance Company, successor to ACE Insurance Company of Ohio, formerly known as CIGNA Insurance Company of Ohio, formerly known as Aetna Insurance Company of Ohio |
| Chubb Insurance Company of Puerto Rico, formally known as ACE Insurance Company of Puerto Rico, formerly known as CIGNA Insurance Company of Puerto Rico, formerly known as Aetna Insurance Company of Puerto Rico |
| ACE American Insurance Company, successor to ACE Insurance Company of Texas, formerly known as CIGNA Insurance Company of Texas, formerly known as Aetna Insurance Company of Texas |
| ACE Insurance Company of the Midwest, formerly known as CIGNA Insurance Company of the Midwest, formerly known as Aetna Insurance Company of the Midwest |
| ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Company, successor to Aetna Insurance Company |
| ACE American Reinsurance Company, formerly known as CIGNA Reinsurance Company, |

| |
|---|
| formerly known as INA Reinsurance Company |
| Chubb Holdings, successor to Chubb Executive Risk Inc., fka Executive Risk Inc., fka Executive Re Indemnity Company, fka ERIC Reinsurance Company, fka Excess Insurance Company, fka American Excess Insurance Company |
| Executive Risk Specialty Insurance Company, fka Executive Re Specialty Insurance Company |
| Federal Insurance Company |
| Illinois Union Insurance Company, successor to GATX Insurance Company |
| Great Northern Insurance Company |
| Highlands Insurance Company, in receivership, by and through its claim handling agent, Cravens, Dargan & Co., Pacific Coast |
| Horace Mann Insurance Company |
| Illinois Union Insurance Company |
| Imperial Casualty Company but only as respects policies issued through Cravens, Dargan & Company, Pacific Coast or GATX Underwriters Inc. |
| ACE Employers Insurance Company, formerly known as CIGNA Employers Insurance Company, formerly known as INA Employers Insurance Company |
| ACE American Insurance Company, successor to ACE Insurance Company of Illinois, formerly known as CIGNA Insurance Company of Illinois, formerly known as INA Insurance Company of Illinois |
| ACE American Reinsurance Company, formerly known as CIGNA Reinsurance Company, formerly known as INA Reinsurance Company |
| INA Surplus Insurance Company |
| ACE American Insurance Company, formerly known as CIGNA Insurance Company successor to INA Underwriters, successor to Allied Insurance Company |
| Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North, as successor to Indemnity Insurance Company of North America |
| Westchester Fire Insurance Company with respect to policies novated from Industrial Indemnity Insurance Company |

| |
|---|
| Westchester Fire Insurance Company with respect to policies novated from Industrial Underwriting Insurance Company. |
| Westchester Surplus Lines Insurance Company, formerly known as Industrial Insurance Company of Hawaii, Inc. |
| Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America |
| Westchester Fire Insurance Company with respect to policies novated from International Insurance Company |
| Westchester Fire Insurance Company with respect to policies novated from International Surplus Lines Insurance Company |
| Motor Vehicle Casualty Company, but only as respects policies issued through Cravens, Dargan & Company, Pacific Coast |
| Westchester Fire Insurance Company with respect to policies novated from Mount Airy Insurance Company |
| Westchester Fire Insurance Company with respect to policies novated from North River Insurance Company |
| Northwestern Pacific Insurance Company |
| Pacific Employers Insurance Company |
| Pacific Indemnity Company |
| Service Fire Insurance Company, by and through its claim handling agent, Cravens, Dargan & Co., Pacific Coast |
| Texas Pacific Insurance Company |
| Westchester Fire Insurance Company with respect to policies novated from U.S. Fire Insurance Company |
| Vigilant Insurance Company |
| Westchester Fire Insurance Company with respect to policies novated from Viking Insurance Company |
| Westchester Fire Insurance Company |
| Westchester Surplus Lines Insurance Company fka Industrial Insurance Company of Hawaii |

Oakwood Insurance Company (successor by merger to Central National Insurance Company of Omaha, but only with respect to those policies issued through Cravens, Dargan & Company, Pacific Coast)

## EXHIBIT F – MOTORISTS ENTITIES TO BE RELEASED

| |
|---|
| Motorists Mutual Insurance Company |
| American Hardware Mutual Insurance Company |
| Phenix Mutual Fire Insurance Company |
| Wilson Mutual Insurance Company |
| BrickStreet Mutual Insurance Company |
| PinnaclePoint Insurance Company |
| NorthStone Insurance Company |
| SummitPoint Insurance Company |
| AlleghenyPoint Insurance Company |
| MICO Insurance Company |
| Consumers Insurance USA, Inc. |
| Motorists Commercial Mutual Insurance Company |
| Iowa Mutual Insurance Company |
| Motorists Life Insurance Company |
| Iowa American Insurance Company |
| Broad Street Brokerage Insurance Agency, LLC |
| MCM Insurance Agency, Inc. |
| IMARC, LLC |

# EXHIBIT G – STIPULATION OF DISMISSAL

WILLIAMS LAW FIRM
Mark S. Williams
235 E. Pine, P.O. Box 9440
Missoula, Montana 59807-9440
(406) 721-4350 Fax: (406) 721-6037
mark@wmslaw.com

CROWELL & MORING LLP
Mark D. Plevin (admitted *pro hac vice*)
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
(415) 986-2800 Fax: (415) 986-2827
mplevin@crowell.com

Attorneys for Plaintiffs: ACE Fire Underwriters Company
and ACE Property & Casualty Insurance Company

## UNITED STATES DISTRICT COURT

## DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| ACE FIRE UNDERWRITERS COMPANY and ACE PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> NANCY GIBSON, AS RECEIVER FOR ROBINSON INSULATION COMPANY; AMERICAN STATES INSURANCE COMPANY; and MOTORISTS COMMERCIAL MUTUAL INSURANCE COMPANY, <br><br> Defendants. | CV 19-181-M-DLC-KLD <br><br><br> **STIPULATION OF DISMISSAL WITH PREJUDICE OF ALL CLAIMS BY ALL PARTIES** |

## STIPULATION OF DISMISSAL WITH PREJUDICE
## OF ALL CLAIMS BY ALL PARTIES

IT IS HEREBY STIPULATED AND AGREED as follows by plaintiffs and counterclaim defendants ACE Fire Underwriters Company and ACE Property & Casualty Insurance Company (collectively, "Chubb"), defendant, counterclaimant, cross-claimant, and cross-claim defendant Nancy Gibson, as receiver for Robinson Insulation Company (the "Receiver"), defendant, counterclaimant, cross-claimant, and cross-claim defendant American States Insurance Company ("American States"), and defendant, counterclaimant, cross-claimant, and cross-claim defendant Motorists Commercial Mutual Insurance Company ("Motorists"), as follows:

1.      Chubb hereby dismisses its complaint as against the Receiver, American States, and Motorists, with prejudice.

2.      The Receiver hereby dismisses her counterclaims against Chubb and her cross-claims against American States and Motorists, with prejudice.

3.      American States hereby dismisses its counterclaims against Chubb and its cross-claims against the Receiver and Motorists, with prejudice.

4.      Motorists hereby dismisses its counterclaims against Chubb and its cross-claims against the Receiver and American States, with prejudice.

5.      Any and all other claims asserted in this action by any party against any other party are dismissed, with prejudice.

6.      Each party shall bear its own fees and costs with respect to this action and this stipulation of dismissal with prejudice.

[signatures begin on next page]

Dated: _____ __, 2020

By: _/s/Mark S. Williams_____
Mark S. Williams
WILLIAMS LAW FIRM

Mark D. Plevin  (admitted *pro hac vice*)
CROWELL & MORING LLP

Attorneys for Plaintiffs and Counterclaim Defendants:
ACE Fire Underwriters Company and ACE Property &
Casualty Insurance Company

Dated: _____ __, 2020

By: _/s/ Allan M. McGarvey_
McGARVEY, HEBERLING, SULLIVAN & LACEY, P.C.

On behalf of:
Defendant, Counterclaimant, Cross-Claimant, and
Cross-claim Defendant Nancy Gibson, in her capacity
as Court-appointed Receiver for Robinson Insulation
Company

Dated: _____ __, 2020

By: _/s/ Adam M. Shaw_
Adam M. Shaw
BROWN LAW FIRM, P.C.

Michael J. Cohen  (admitted *pro hac vice*)
Garrett A. Soberalski  (admitted *pro hac vice*)
Hannah M. Compton  (admitted *pro hac vice*)
MEISSNER TIERNEY FISHER & NICHOLS S.C..

Attorneys for Defendant, Counterclaimant,
Cross-Claimant, and Cross-claim Defendant American
States Insurance Company

Dated: _____ __, 2020

By: _/s/ Shane P. Coleman_
Shane P. Coleman
HOLLAND & HART LLP

Attorneys for Defendant, Counterclaimant,
Cross-Claimant, and Cross-claim Defendant Motorists
Commercial Mutual Insurance Company

## EXHIBIT H – FORM OF SETTLEMENT APPROVAL ORDER

## IN THE ASBESTOS CLAIMS COURT OF THE STATE OF MONTANA

| | |
|---|---|
| IN RE ASBESTOS LITIGATION, *Consolidated Cases* | Cause No. AC 17-0694<br><br>JUDGMENT AND ORDER APPROVING SETTLEMENT (Robinson Insulation Receivership) |

Receiver Nancy Gibson and Allan McGarvey and Mark Kovacich on behalf of certain Libby Plaintiffs have jointly filed a motion (the "Motion") asking this Court to authorize the Receiver's settlement of the insurance coverage claims by Robinson Insulation Company ("Robinson") against ACE Fire Underwriters Insurance Company and ACE Property & Casualty Insurance Company (collectively, "Chubb"), American States Insurance Company ("American States"), and Motorists Commercial Mutual Insurance Company ("Motorists" and, collectively with Chubb and American States, the "Settling Insurers"). A copy of the "Settlement Agreement and Release" (the "Agreement") between the Receiver and the Settling Insurers is attached to the joint motion of the Receiver and certain Libby Plaintiffs, and has been reviewed by this Court.[2]

The court has reviewed the following documentation attached to the Motion and makes these findings based thereon:

(a) Exhibit A is a discovery response filed on behalf of Grogan Robinson Lumber Company ("Grogan"). It establishes, and the court finds, (i) that Grogan was the successor to Lumber Yard Supply and Grogan-Robinson Lumber Company; (ii) ownership and related management of Robinson and Grogan and its predecessors overlapped; and (iii) that, following the winding up of its assets and affairs, Grogan was dissolved in 2018.

(b) Exhibit B is a copy of the Agreement which the Court finds to exhaust the limits of liability coverages in the policies settled thereby.

(c) Exhibit C is an affidavit of Allan McGarvey, attorney for hundreds of Libby asbestos claimants including those with and without claims of exposures during the insurance coverage period. It establishes, and the court finds, that (i) the Agreement was reached

---

[2] Unless defined separately herein, all capitalized terms in this Order have the meanings ascribed to them in the Agreement.

following extensive efforts to identify insurance policies potentially providing coverage for claims against Robinson; (ii) despite reasonable efforts, a number of policies and /or declaration sheets, endorsements, and forms for several policies could not be located; (iii) secondary evidence of coverages provided by certain policies was located but was also incomplete; (iv) pleadings in a declaratory judgment action filed in U.S. District Court in Montana were filed setting forth the coverage contentions and defenses of the parties to the Agreement; (v) extensive analysis and negotiation was pursued to reach agreement on the coverages provable and the meanings thereof; and (vi) counsel for all known individuals with claims against Robinson are satisfied that the Agreement exhausts the maximum available coverage under the settled policies.

(d) Exhibit D is a Qualified Settlement Fund Trust which the court finds (i) will receive and hold proceeds of the settlement of the settled insurance; (ii) upon further application to and approval of this court, would distribute such proceeds to resolve claims of those with claims against the Receivership estate which constitute occurrences under the coverages of the settled insurance; and (iii) is the appropriate and necessary and customary mechanism to manage those proceeds, as they must be, for the purpose of resolving corresponding claims.

(e) The affidavits of Allan McGarvey and Receiver Nancy Gibsonestablish, and the court finds, that (i) lawsuits have been filed against both Robinson and Grogan alleging claims for strict product liability for the same asbestos injuries with the difference being that Robinson was primarily a manufacturer of the product while Grogan and its predecessor entities were distributors of the product, (ii) the Settling Insurers have been providing a defense of all such claims under reservation of rights, (iii) plaintiffs' counsel have apprised defense counsel that many lawsuits may be brought against Grogan alleging strict product liability for damages for which Robinson is alleged to also be liable, and (iv) the resolution of the claims against Robinson will therefore not eliminate lawsuits against Grogan for the same injuries or types of injuries.

The court concludes as follows:

(A)     This Court's March 23, 2018 Order (the "Order") creating the receivership granted authority for the Receiver to make demands that the insurers settle claims against Robinson (Order ¶1(c)). The Order, at Order ¶2 (a),(b) requires that the Receiver obtain this Court's approval of "specific proposals" for settlement.

(B)     The proposed settlement entered into by the Receiver and its insurers is appropriately made subject to this Court's approval.

(C)     The settlement is in the best interests of the Robinson and Grogan receivership estates because it is a fair and reasonable compromise of disputed insurance

coverage issues. The settlement was negotiated in good faith and at arm's length between the Receiver and Mr. McGarvey, on the one hand, and each of the Settling Insurers, on the other hand.

(D)     The compromise embodied in the Agreement allows the Receiver to liquidate Robinson's and Grogan's insurance coverage for distribution to persons asserting claims against Robinson and/or Grogan, subject to the establishment of a Trust that would, once approved by this court, fairly and equitably distribute the insurance settlement proceeds to those claimants against Robinson and/or Grogan who satisfy the Trust's requirements.

(E)     The Agreement provides, at paragraph 3.3, that each Settling Insurer shall pay its respective settlement amount into a Qualified Settlement Fund ("QSF"), and that the Receiver shall not distribute any funds from the QSF except as authorized by this court.

(F)     The Receiver has provided due and adequate notice of the Motion, the deadline to object to the Motion, the Agreement, and the subject matter thereof to all persons known to have asserted Asbestos Claims (as defined in the Agreement) against either Robinson or Grogan and to all of its other insurers, including Home Insurance Company (in liquidation) and Mission Insurance Company (in liquidation). In addition, to ensure the broadest notice possible, the Receiver and the Settling Insurers have published notice of the (i) Motion, (ii) the hearing on the Motion, and (iii) the Agreement in *USA Today, The Western News, Kalispell Daily Interlake, Missoulian, Great Falls Tribune,* and *Helena Independent Record* on [May 26], 2020, in the *Billings Gazette* on [May 27], 2020, and in the *Sanders County Ledger* on [May 28], 2020. Such notice, including the aforesaid notice by publication, was good and sufficient under the particular circumstances to provide adequate and appropriate notice to both known and unknown Asbestos Claimants, and no other or further notice is or shall be required. Accordingly, a reasonable opportunity to object or be heard with respect to the Motion and relief requested herein has been properly afforded to all persons and entities potentially affected by the Agreement.

(G)     The relief sought in the Motion is in the best interests of the Robinson and Grogan receivership estates and the Asbestos Claimants. The Receiver has demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion. The compromise and settlement with the Settling Insurers embodied in the Agreement is consistent with and within the reasonable range of litigation outcomes if the Receiver were to litigate the matters resolved pursuant to this Order.

(H) The compromises contained in the Agreement are a valid and proper exercise of the reasonable business judgment of the Receiver and represent an exchange for reasonably equivalent value. The releases to be given by the Receiver pursuant to Section 5 of the Agreement are appropriate and should be approved. The Settling Insurers would not have entered into the Agreement or any of the compromises and settlements contained therein, or agreed to pay their respective Settlement Amounts, without the benefit of obtaining the releases contained in the Settlement Agreement and the Injunctions contained in this Order.

(I) This court has inherent equitable authority sufficient to permit it to enter the injunctions contained in Sections 4 and 5 of this Order (the "Injunctions"). The Injunctions are essential to give effect to the settlements and compromises set forth in the Agreement and to fulfill the purposes of both the Robinson and Grogan receiverships. The Settling Insurers have asserted that the Injunctions are a necessary prerequisite for entry into the Settlement Agreement, and the Settling Insurers have informed the Receiver that they will not consummate the settlements and compromises set forth in the Agreement, or pay their respective Settlement Amounts in the absence of the Injunction.

Wherefore, IT IS HEREBY ORDERED and ADJUDGED:

(1) The Motion is granted.

(2) The Agreement settling and releasing the insurance coverage claims of Nancy Gibson, as court-appointed Receiver for Robinson and Grogan, against the Settling Insurers is hereby fully and finally approved.

(3) Settlement proceeds shall be paid to the Receiver, Nancy Gibson, to be held by the Receiver in a QSF, until such time as this court approves the establishment of a Trust and appropriate procedures for the Trust to distribute the settlement proceeds to Asbestos Claimants.

(4) Pursuant to the Court's inherent equitable authority, (a) all Persons who hold or assert, or may in the future hold or assert, any Claim against Robinson, Grogan, or the Receiver arising in connection with the activities covered by the Policies, or in connection with the activities of Robinson or Grogan giving rise to the Claims that have been made or that could be made under the Policies, and (b) all Persons who may claim to be an insured, additional insured, or otherwise entitled to any benefit under the Policies, are permanently stayed, barred, restrained, and enjoined from asserting any such Claim or right to entitlement, from commencing a proceeding, or taking any other action against ACE Fire Underwriters Insurance Company, ACE Property & Casualty Insurance Company, Motorists Commercial Mutual

Insurance Company, or American States Insurance Company (collectively, the "Settling Insurers") or the persons and entities defined in the Agreement as "Insurer Parties" for the purpose of obtaining any recovery or other relief from the Settling Insurers or the Insurer Parties based on, under, arising out of, related or attributable to, and/or in connection with the Policies.

(5)     All claims for contribution, allocation, subrogation, and equitable indemnity, or similar claims, against any of the Settling Insurers (collectively, "Contribution Claims"), whether by parties appearing before the Asbestos Claims Court or not, are hereby BARRED pursuant to the Court's inherent equitable authority. All Contribution Claims against any of the Settling Insurers shall be channeled to the QSF established to hold the Settlement Amounts paid by the Settling Insurers or to any Trust to which the funds in the QSF are transferred following an order by this Court authorizing such transfer.

(6)     This is a final order and judgment for purposes of appeal under Rule 4(1)(a) of the Montana Rules of Appellate Procedure.

DATED AND ELECTRONICALLY SIGNED AS NOTED BELOW.

_/__/2020

_____
Amy Eddy, Asbestos Claims Court Judge

IN THE ASBESTOS CLAIMS COURT OF THE STATE OF MONTANA

| | |
|---|---|
| IN RE ASBESTOS LITIGATION, | Cause No. AC 17-0694 |
| *Consolidated Cases* | AFFIDAVIT OF ALLAN MCGARVEY (Robinson Insulation Receivership) |

State of Montana  )
                  ) ss
County of Flathead )

Allan M. McGarvey, being first sworn, deposes and states:

1. I am an attorney of record for hundreds of plaintiffs with asbestos claim cases in this Court. I have personal knowledge of the matters herein with respect to the proposed Settlement Agreement between the Receiver for Robinson Insulation Company and the Settling Insurers.[1]

2. The clients represented by my firm include asbestos claimants with cases in this Court, many of whom claim exposures during the insurance coverage period of the insurance coverages settled by the Receiver, and many of whom do not have

---

[1] "Settling Insurers" refers to Ace Fire Underwriters Insurance Company and Ace Property & Casualty Insurance Company, Motorists Commercial Mutual Insurance Company and American States Insurance Company and such insurers' affiliated and predecessor insurance entities as defined in the Settlement Agreement.

wholesaler, or retailer of the same vermiculite products for which my clients assert the liability of manufacturer Robinson Insulation Company.

12. Attached is a transcript of a deposition of Owen Robinson, in which he testified as a Rule 30(b)(6) witness on behalf of Grogan Robinson Lumber Company (Tr p.11, line 24) to the following:

> p. 10
> ... Is there any **common ownership** between the
> two companies?
> A: Yes, there was. Yes.
>
> p.14
> ... Lumber Yard Supply
> was the -- was the **wholesale arm** of what we considered as
> our company. Grogan Robinson Lumber Company was the **retail**
> **arm** of what we considered our company.
>
> p.16
> ... Did Lumber Yard Supply sell
> **Zonolite** on a wholesale basis in the 1977 to 1991 time
> period?
> Yes.
>
> p.17
> A. It was used as an attic insulation. That was
> primarily its only use, Zonolite itself. There were other
> products that were **made by Robinson Insulation**, but they
> were never retailed by Lumber Yard Supply.
> Q Was Zonolite the only vermiculite product that was
> sold by Lumber Yard Supply in the '77 to '91 time period?
> A Yes.

13. I have been working with the Receiver and attorneys in the Odegaard Kovacich Snipes firm in drafting of a "Trust Distribution Procedure" (TDP) proposal for

Exhibit C002

the distribution of proceeds of the settlement to claimants meeting coverage, exposure, and medical criteria, which drafting is modeled on the type of TDP used in bankruptcies of asbestos manufacturers. It is my expectation and intent to present to the Court by the time the proposed QSF is funded, a proposal for an equitable distribution mechanism and the appropriate procedures for approval thereof.

FURTHER THE AFFIANT SAYETH NOT.

Dated this 21st day of May, 2020

ALLAN M. McGARVEY

SUBSCRIBED AND SWORN to before me this _21_ day of _May_, 2020.

Notary Public for the State of Montana
Residing at:_____
My Commission expires:_____

ELIZABETH A. CUMMINGS
NOTARY PUBLIC for the
State of Montana
Residing at
Kalispell, Montana
My Commission Expires
July 20, 2020

NOTARIAL SEAL
STATE OF MONTANA

MONTANA ELEVENTH JUDICIAL DISTRICT
FLATHEAD COUNTY

JEREMIAH HARTLE and KAREN )
HARTLE, husband and wife, )
individually and on )
behalf of their minor )
children, )
)
Plaintiff, )
)
v. )     Case No. DV-18-532(B)
)
CONAGRA BRANDS, INC., et )
al., )
)
Defendants. )

VIDEOTAPED 30(b)(6) DEPOSITION OF OWEN ROBINSON

On the 15th of October, 2019, beginning at 10:00 a.m., the videotaped 30(b)(6) deposition of OWEN ROBINSON was heard at The Staybridge Suites Great Falls, 201 Third Street Northwest, Great Falls, Montana, before Holly E. Fox, Court Reporter and Notary Public.

hg.

Exhibit C.1.001

Page 2

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS:
MATTHEW BERGMAN and BRENDAN LITTLE
(via videoconference)
Attorneys at Law
Bergman Draper Oslund
821 Second Avenue, Suite 2100
Seattle, Washington 98104
matt@bergmanlegal.com
brendan@bergmanlegal.com

ETHAN WELDER (telephonically)
Attorney at Law
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, Montana 59901
ewelder@mcgarveylaw.com

APPEARING ON BEHALF OF THE THIRD-PARTY
DEFENDANTS ROBINSON INSULATION COMPANY AND
GROGAN ROBINSON LUMBER COMPANY d/b/a LUMBER YARD
SUPPLY:
NATHAN A. HUEY, ESQ.
Attorney at Law
Gordon Rees Scully Mansukhani
201 West Main Street, Suite 101
Missoula, Montana 59802
nhuey@grsm.com

APPEARING ON BEHALF OF THE THIRD-PARTY
DEFENDANTS HUTTIG BUILDING PRODUCTS, INC.,
PALMER G. LEWIS, and ACE HARDWARE:
CHRISTY MCCANN and DANIEL AUERBACH
(telephonically)
Attorneys at Law
Browning Kaleczyc Berry & Hoven, P.C.
201 West Railroad Street, Suite 300
Missoula, Montana 59802
christy@bkbh.com
daniel@bkbh.com

Page 3

A P P E A R A N C E S, continued

APPEARING ON BEHALF OF DEFENDANT AND THIRD-PARTY
PLAINTIFF WESTERN BUILDING CENTER:

BENJAMIN J. HAMMER, ESQ. (Telephonically)
Attorney at Law
Hammer, Quinn & Shaw, PLLC
100 Financial Drive, Suite 100
Kalispell, Montana 59904-0310
benhammer@attorneysmontana.com

APPEARING ON BEHALF OF DEFENDANT CONAGRA BRANDS,
INC.:

MAXON DAVIS
Attorney at Law
Davis, Hatley, Haffeman & Tighe, PC
101 River North Drive
Milwaukee Station, Third Floor
Great Falls, Montana 59401
max.davis@dhhtlaw.com

Page 4

I N D E X

Page

EXAMINATION
By Mr. Bergman 6

E X H I B I T S

No.    Description                                    Page
1  Notice of 30(b)(6) deposition                     11
2  Third Party Defendant Grogan Robinson             13
   Lumber Company d/b/a Lumber Yard Supply's
   Responses and Objections to Plaintiffs'
   First Interrogatories and Requests for
   Production
3  Transcript of 30(b)(6) deposition of WBC's        27
   corporate representatives

4  Material Safety Data Sheet, two pages             31

Page 5

The following proceedings were had and testimony taken:

* * * * * * * * * *

THE VIDEOGRAPHER: Let the record show that this is the time and place designated for the videotaped deposition of 30(b)(6) witness Owen Robinson in the matter of Jeremiah Hartle and Karen Hartle, plaintiffs, versus ConAgra Brands, Inc., et al., defendants, in the Montana Eleventh Judicial District Court, Flathead County, Cause Number DV-18-52- -- 532(B).

The date today is October 15, 2019. The time on the monitor is -- is 10:04. My name is Wade Larson. I'll be operating the camera today. The court reporter is Holly Fox.

And I now ask counsel to please voice-identify themselves and state whom they represent.

MR. BERGMAN: Matthew Bergman for the plaintiffs.

MR. LITTLE: Brendan Little for the plaintiffs.

MR. HUEY: Nathan Huey for Lumber Yard Supply and Robinson Insulation Company.

MR. DAVIS: Max Davis for ConAgra.

MS. MCCANN: Christy McCann for --

MR. HAMMER: Ben -- go ahead.

MS. MCCANN: Christy McCann for Huttig Building

Exhibit C.1.002

Page 6

Products, Palmer G. Lewis, and Ace Hardware.

MR. HAMMER: Ben Hammer for Western Building Center.

MR. WELDER: Ethan Welder for plaintiffs.

MR. AUERBACH: Dan Auerbach for Ace Hardware, Huttig, and Palmer G. Lewis.

THE VIDEOGRAPHER: Is that everyone? Would the reporter please swear in the witness.

OWEN ROBINSON, having been first duly sworn by the Court Reporter, was examined and testified as follows:

EXAMINATION
BY MR. BERGMAN:

Q    Good morning, sir.

A    Good morning.

Q    Could you please introduce yourself.

A    My name is Owen Robinson.

Q    And, Mr. Robinson, where do you live?

A    I live here in Great Falls, Montana.

Q    And, sir, what is your relationship to Grogan Robinson?

A    Grogan Robinson? I was -- I ended up my career with Grogan Robinson as president and CEO.

Page 7

Q    And can you just briefly forward for us the progress of your career? And I guess, before I do that, are you currently retired, sir?

A    I am, except for being on the -- except for being on the city commission. But I consider that work for the community, not -- not a career. I get paid $312 a month, if that answers the question.

Q    That does, sir. That probably pays for the Maalox you need to ingest to put up with that. So I -- I commend you for your service.

MR. HUEY: Mr. Bergman? Mr. Bergman, I'm sorry. This is Nathan Huey.

I wonder if we could just clarify for the record when we talk about Grogan Robinson which entity we're actually referring to, because it's a little bit of a complicated corporate history.

MR. BERGMAN: Indeed. We're referring to Grogan Robinson as successor to Lumber Supply [sic].

THE DEPONENT: Right. When I -- the business that you're concerned about is really Lumber Yard Supply, and it was at the time. And we had to change the name when I sold Lumber Yard Supply in 2015. The company that bought it, Nassau Supply, also bought the name. It took me a couple years to close down the company, so I had to change it. I had to find a name for it, and I chose to go back to the

Page 8

old name, Grogan Robinson Lumber Company. So --

Q    (By Mr. Bergman) I understand, sir, and --

A    Okay.

Q    I didn't mean to interrupt you, sir, so please -- please --

A    No, that's fine.

Q    -- finish.

Can you trace for us the progress of your career from the time -- from the time you graduated from high school to the time you retired?

A    Yes. When I graduated from high school, I spent a couple of years when I was in college working for the company. I think that would have been '65, '66 and '67. And then I moved to Los Angeles. Came back to work for the company in 1976. And that's when my career as a full-time employee started, in 1976.

I was brought there as -- as the computer guy. In those days, you bought a computer and then hired somebody to write the software. Nowadays you buy the software, and the computer comes with it. So I wrote all the software for -- for -- and at that time it would have been Grogan Robinson Lumber Company. And I wrote it -- and Lumber Yard Supply would have been the -- would have been a subsidiary.

So I wrote the software for accounts receivable. Mostly accounts receivable, but also accounts payable and

Page 9

got into the general ledger when they finally decided that we would -- we finally decided that it would be better to buy a computer that had software on it. That would have been probably --

Q    And did you work --

(Simultaneous talking.)

A    I'm sorry. Excuse me. Go ahead, Mr. Bergman.

Q    Did you work for Grogan Robinson continually from 1976 until the time you retired?

A    Yes.

Q    And you testified that in the '65 to '67 period you worked for -- and you said "the company."

Was that also Grogan Robinson?

A    Yeah, it was. One of those years I worked for Missouri River Lumber Company, which was a subsidiary of Grogan Robinson at Fort Benton. They had a little lumber yard in Fort Benton. There was a big hailstorm, and I went back -- went and worked there that summer. The other two would have been in Great Falls for Grogan Robinson.

THE COURT REPORTER: I'm sorry. Is someone on the line? Could you mute your phone -- mute your line?

MR. DAVIS: Sounds like they did.

THE COURT REPORTER: Thank you.

Q    (By Mr. Bergman) Sir, did -- have you ever worked for Robinson Insulation Company?



Exhibit C.1.003

Page 10

A   Never.

Q   Okay. And is there a relationship between Grogan Robinson and Robinson Insulation Company?

A   No.

Q   Okay. Is there any common ownership between the two companies?

A   Yes, there was. Yes.

Q   And can you describe that for us, please, sir.

A   Yes. Robinson Insulation started because my father, he graduated from Princeton University in 1936. And it was during the recession. There wasn't enough -- my great-grandfather and my grandfather would not hire my dad in the company because it was during the recession, and to do that, they would have had to fire somebody. We had some line yards throughout Montana and North Dakota.

And so he worked in the steel mills. He wasn't a very strong man. He just hated it. And so the opportunity came; my grandfather bought a company and named it Robinson Insulation, made my dad a partner in it, but he -- but my grandfather was the biggest owner in it. And they started a company -- that company, and it sold what ended up being Zonolite Insulation, but it was called Unifill * at the time.

Q   And was your father Brooks Robinson, sir?

A   Yes, my father was Brooks Robinson.

Page 11

Later in that company, my -- my uncle, Dave Robinson, who used to work for W.R. Grace, left that company and went to work for Robinson Insulation. So at one time there was three owners: My grandfather, Fred Robinson; my father, Brooks Robinson; and his brother, my uncle, Dave Robinson. And my grandfather died. Then there were only two owners: Brooks and Dave.

Q   And when do you recall Mr. Dave Robinson working for W.R. Grace, and when did he come to work for Robinson Insulation?

A   Gee. I'm only guessing. I really don't know. But I think it would have been about 1978.

Q   Okay. And, again, no one wants you to guess, Mr. Robinson.

Would it be your best estimate it was in the mid-'70s?

A   That would be an estimate, yes.

Q   Okay. Sir, I'd ask that the court reporter provide you with Exhibit 1.

(Exhibit 1 marked for identification.)

Q   (By Mr. Bergman) Mr. Robinson, I'm -- you've been handed Exhibit 1, which is the notice of 30(b)(6) deposition in this matter. Do you understand, sir, that you're testifying on behalf of -- of Grogan Robinson Lumber Company and Lumber Yard Supply in the context of this

Page 12

deposition here today?

A   Yes.

Q   And you understand that you are the -- you are the corporate representative for those entities in this testimony?

A   Yes.

Q   If you could turn to Page 2 of Exhibit 1.

A   (Complies.)

Q   You see at the bottom of Page 2 of Exhibit 1 there are specific topics, and that they -- there's -- they continue 1 through 3 on Page 2 of Exhibit 1, and then continue on Page 3 and 4 of Exhibit 1.

Do you see those topics, sir?

A   I do.

Q   And are you the witness that has been designated by Grogan Robinson and Lumber Yard Supply to testify on behalf of the 12 topics set forth on Exhibit 1?

A   Well, I -- it's kind of hard to answer since it's no longer a corporation. But, yes, I suppose I would be the one.

MR. HUEY: And just for the record, we did serve objections to Topics 9, 11, and 12.

MR. BERGMAN: I understand. Thank you, Counsel.

Q   (By Mr. Bergman) I would then -- at this point, if I could ask the court reporter to pull out Envelope 3 and

Page 13

mark it as Exhibit 2.

(Exhibit 2 marked for identification.)

Q   (By Mr. Bergman) Mr. Robinson, you've been handed Exhibit 2, and I guess my question is, are these the interrogatory responses that Grogan Robinson Lumber Company d/b/a Lumber Yard Supply furnished in this case?

A   Yes, they appear to be. Yes.

Q   Okay. I'm going to be asking you some questions about the responses that are set forth in Exhibit 2, but before I do that, sir, can you describe in general terms the nature of the business of Grogan lumber company?

And for purposes of my examination today, I'm focusing on the period between 1977 and 1991.

MR. HUEY: And you mean Lumber Yard Supply, Mr. Bergman?

MR. BERGMAN: I do.

THE DEPONENT: Yeah, I can answer that.

Actually -- actually, they were two separate companies at that time: Grogan Robinson and Lumber Yard Supply. And I believe these answers here refer to Lumber Yard Supply, because Lumber Yard Supply at that time was a wholesale building materials business. Grogan Robinson had a line yards of retail lumberyards.

And so these refer to Lumber Yard Supply. It's not just a d/b/a. It happens to be a d/b/a because we changed

 

Exhibit C.1.004

Page 14

the name at -- in 2015 again, but at that time Lumber Yard Supply was a -- was a separate company -- mostly owned by Grogan Robinson, by the way -- but it was a separate company doing business as Lumber Yard Supply Company.

And then there was Grogan Robinson Lumber Company that also had some -- one of their subsidiaries was Lumber Yard Supply because they owned most of it, but they also had other subsidiaries and also just Grogan Robinson Lumber Company as a retail lumberyard.

Q (By Mr. Bergman) Was Lumber Yard Supply and Grogan Lumber -- so I want to make sure I'm clear on my nomenclature.

There was Lumber Yard Supply, and then was it, in the '77 to '91 period, referred to as Grogan Lumber Company?

A No, not really. There was a -- I'll try and re-explain it. I'm not sure I'm being clear.

But during that period of time, Lumber Yard Supply was the -- was the wholesale arm of what we considered as our company. Grogan Robinson Lumber Company was the retail arm of what we considered our company.

Q Okay. I appreciate that clarification, sir.

Did Grogan Robinson Lumber Company and Lumber Yard Supply operate out of the same location?

A No.

Page 15

Q All right. What were the relative locations of the two entities, sir?

A Well, Lumber Yard Supply had a location in Great Falls down near the river -- Missouri River. Grogan Robinson Lumber Company had a -- at that -- during those years that you referred to, had a retail -- two retail yards in Great Falls: One downtown and the other on the west side. They had a retail yard in Havre, Montana. They had a retail yard -- although under a different company's name -- in Fort Benton called Missouri River Lumber Company. They had a retail yard in Helena called Peterson Lumber Company, and they had retail yard in Butte called Pioneer Lumber Company.

Q All right. Sir, Lumber Yard Supply, what wholesale products did it furnish?

A It -- well, almost -- as many building material products as we could represent. Biggest products would have been lumber and plywood. And we had roofing. We had windows, siding. And -- and that's all that really comes to mind right now. But we had a lot of little smaller products too.

And Lumber Yard Supply did sell to Grogan Robinson, as well as -- as other companies. So Grogan Robinson would have been like any other retail lumber company in the state. And they bought from Lumber Yard

Page 16

Supply and many other wholesalers. And Lumber Yard Supply would have been a wholesaler selling to Grogan Robinson and other retail yards.

Q And in addition to -- did Lumber Yard Supply furnish all of the products that were sold by Grogan Robinson? Or did Grogan Robinson obtain products from other -- other entities?

A Grogan Robinson probably bought 30 to 35 percent of their materials from Lumber Yard Supply. They were the -- Lumber Yard Supply's biggest customer.

Q And did Lumber Yard Supply furnish wholesale Zonolite?

(Clarification by the court reporter.)

Q (By Mr. Bergman) Did Lumber Yard Supply sell Zonolite on a wholesale basis in the 1977 to 1991 time period?

A Yes.

Q And did Lumber Yard Supply sell or supply Zonolite on a wholesale basis to the Grogan Robinson entities in the 1977 to 1991 time period?

A Yes.

Q What percentage -- roughly speaking, sir -- was the sale of Zonolite by Lumber Yard Supply relative to other products sold by the company in the '77 to '91 time period?

Page 17

A I can't give you an exact percentage, but it was a very small part of their business. Very small.

Q Okay. And, again, sir, I'm not asking you to guess. No one wants you to guess.

Would you say it was 5 percent? Was it more or less than 5 percent?

A Less than 5 percent, easily.

Q Okay. And what were the uses of Zonolite, so far as you know, in the '77 to '91 time period for which it was sold by Lumber Yard Supply?

A It was used as an attic insulation. That was primarily its only use, Zonolite itself. There were other products that were made by Robinson Insulation, but they were never retailed by Lumber Yard Supply.

Q Was Zonolite the only vermiculite product that was sold by Lumber Yard Supply in the '77 to '91 time period?

A Yes.

Q Are you aware of other applications for Zonolite besides attic insulation?

A No, I -- well, one exception. I think that they -- some people would use it and put it in soil as a -- as a moisture reliever, but that's not what we sold it as. But some people would say, Well, I'll put Zonolite and mix it with my soil, and it retains moisture a little better. But that was not what we sold it as. We sold it

 

Exhibit C.1.005

Exhibit 1

IN THE ASBESTOS CLAIMS COURT OF THE STATE OF MONTANA

| | |
|---|---|
| IN RE ASBESTOS LITIGATION, | Cause No. AC 17-0694 |
| *Consolidated Cases* | **INSURED CLAIMS QUALIFIED SETTLEMENT FUND TRUST** |

1.    **Name and Purpose of the Trust.** The Trust shall be known as the Insured Claims Qualified Settlement Fund Trust (hereafter, the "Trust"). The purpose of the Trust is to create a trust entity to assume and take assignment of all rights and obligations of the Receiver (as defined herein) for Robinson Insulation Company and Grogan Robinson Lumber Company with respect to settled liability insurance coverage of Claims (as defined herein) against those entities, and to fulfill distribution obligations arising from the settlement of insurance claims. The Trustee shall receive and distribute the Contributions referenced in Paragraph 2 below in a manner consistent with the terms and conditions described in the Settlement Agreement (as defined herein and attached hereto as Exhibit 1 and incorporated herein by this reference) to Insured Claimants (as defined herein) so

as to resolve the personal injury claims to the extent of such liability insurance coverage. The Trust is established as a qualified settlement fund ("QSF") in accordance with 26 U.S.C. § 468B and its corresponding regulations, 26 C.F.R. § 1.468B.

2.     **Contributions to the Trust.** The following contributions (the "Contributions") will be made to the Trust:

A. Upon fulfillment of the conditions in the Settlement Agreement including Court approval, Settlement Amounts totaling $11,625,000.00 shall be paid to the Trust by Insurers (as defined herein) which have resolved their obligations under Policies (as defined herein) with respect to Claims against the Robinson Entities (as defined herein) and Grogan Entities (as defined herein).

B.     Upon any future Court-approved settlement of insurance obligations of other insurers with respect to Claims against the Robinson Entities and Grogan Entities, all resulting payments from such insurers or liquidators of insolvent insurers which have resolved their insurance obligations shall be paid to the Trust.

Contributions made to the Trust shall not be construed as fines, penalties, monetary sanctions, or punitive damages.

3.     **Assignment and Assumption of Rights and Responsibilities.** Subject in all events to the terms of the Settlement Agreement, all rights and responsibilities of the Receiver (as defined herein) with respect to the above described

Contributions, and distributions thereof, including all rights and duties of the Receiver arising under the Settlement Agreement, are hereby assigned to and assumed by the Trust, and the Receiver and Receivership estate shall have no further duties with respect thereto. The Trust shall indemnify the Receivership estate and Receiver for any claim, liability, or defense expense arising from the assignments and assumptions of rights and responsibilities under this Trust and the Receivership estate.

4.    **Dispositive Provisions.** Trust funds shall be used as follows:

A.    *Payment of Income and Principal.* During the term of the Trust, the Trustee shall pay or apply such part (or all) of the income and principal of the Trust to resolve Insured Claims against the Robinson Entities and Grogan Entities, which payments are subject to the other terms and provisions of the Trust and requirements of the Settlement Agreement.

B.    *Trust Distribution Procedures.* Payments on Insured Claims shall be made pursuant to the terms of a Court-approved Trust Distribution Procedure created to afford equitable claim resolution of Insured Claims in a manner consistent with claim values in the tort system.

C.    *Trust Administration.* Costs of administration of the Trust, including payment of the Trustee's fees and expenses, such as professional accounting services, shall be paid by the Trust from the Trust Funds.

5.     **Activities and termination.** The activities of the Trust shall be limited as follows:

A.     *No Authority to Conduct Business.* The purpose of the Trust is limited to the matters set forth herein, and the Trust shall not be construed to confer upon the Trustee any authority to carry on any business or activity for profit.

B.     *Termination of the Trust.* The Trust shall terminate upon distribution of all trust assets and upon order of the Court.

C.     *Alterations, Amendments, and Revocation.* The Trustee's duties may be altered, amended, or revoked from time to time but only (a) in a manner that is consistent with the Settlement Agreement and purposes above described and (b) is ordered by the Court.

6.     **Trustee**

A.     *Initial Trustee.* The initial Trustee of the Trust shall be Kent Saxby, 221 1st Avenue East, P.O. Box 3038 Kalispell, MT 59903 (hereinafter referred to as the "Trustee").

B.     *Management of the Corpus of the Trust.* The Trustee shall be empowered to manage the corpus of the Trust as it appears advisable in order to effectuate the purposes of the Trust. This authority shall include, but not be limited to, the investment of the monetary assets of the Trust and earnings thereon, if any, in one or more money market accounts which shall be treated as a single fund

Exhibit H006

without distinction between principal and income. For purposes of this paragraph, "money market account" shall mean a money fund whose objectives are current income consistent with liquidity and low risk, the maintenance of a portfolio of high quality, short-term money market instruments, and maintenance of a constant $1.00 net asset value per share. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Insured Claims Qualified Settlement Fund Trust. Subject to the goal of maintaining adequate liquidity, the Trustee may invest some of the monetary assets of the Trust, in the sole discretion of the Trustee, in high quality, low risk investments, such as United States Treasury bills and other United State Government-backed securities. Medium risk, high risk, or speculative investments are expressly prohibited.

C. *Continuing Jurisdiction of Court.* The Court shall have continuing jurisdiction of the administration of the Trust and the performance of trust duties by the Trustee. In order to enable the Court to exercise its continuing jurisdiction, the Trustee shall report to the Court once every six months on an accounting of Trust assets and payments, including amounts maintained in order to pay any liens and specifically Medicare and/or Medicaid liens, including amounts set forth in final demand letters from Medicare and Medicaid. The reports prepared by the

Exhibit H007

Trust for the Court shall also be provided in electronic format to the Insured Claimants' counsel.

7.  **Express Powers of Trustee.** Without in any way limiting the power and discretion conferred upon the Trustee by the other provisions of the Trust or by law, the Trustee is expressly authorized and empowered as hereinafter set forth:

A.  *Payment of Expenses of Administration.* To incur and pay any and all charges, taxes, and expenses upon or connected with the Trust in the discharge of its fiduciary obligations under the Trust. All such payments shall be made using the assets of the Trust.

B.  *Retention of Property.* To hold and retain all or any part of the Trust in the form in which the same may be at the time of the receipt by the Trustee, as long as it shall deem advisable, and without any liability for any loss of principal or income by reason of such retention.

C.  *Preservation of Principal.* Notwithstanding any other provision in the Trust, to at all times hold, manage, invest, and reinvest the assets of the Trust in a manner designed to preserve the accrued income and principal of the Trust for the purposes of the Trust.

D.  *Retention of Investment Advisor and Other Consultants.* To engage the services of (and pay compensation to) an investment advisor, accountants,

agents, managers, counsel, or other consultants with respect to the management of investments of the Trust, the management of the Trust, or any other matters.

E. *Execution of Documents of Transfer.* To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

F. *Resolution of Claims.* The Trustee is authorized to resolve claims pursuant to the terms of Trust Distribution Procedures that are approved by the Court, and to exercise all decisions, claim acceptance, and discretion described therein, including with respect to proof of claim requirements, exceptional claim valuation, and setting and adjustment of a payment percentage. The Trustee shall assume and fulfill all requirements of the Settlement Agreement, including provisions for indemnity of insurers and releases by claimants.

G. *Resolution of Reimbursement Claims and Liens.* The Trustee is authorized to negotiate and compromise Medicare liens or reimbursement claims and Medicaid liens or reimbursement claims on an individual-by-individual Claimant basis. No payment from the Trust to an individual Claimant shall be made until all Medicare and Medicaid liens or reimbursement claims with respect to that individual Claimant are identified and such liens or reimbursement claims with respect to that individual Insured Claimant have been satisfied or resolved in

writing by the appropriate state or federal agency. The Trustee shall require, as a condition of any payment to an Insured Claimant, that such Claimant provide all necessary information to fulfill any Medicare and/or Medicaid reporting obligations.

H.      *Litigation.* Upon obtaining approval of the Court, to institute and defend litigation in the name of the Trust.

I.      *Execution of Contracts and Agreements.* At the direction of the Court, to make, execute, acknowledge, and deliver any and all contracts or agreements on behalf of the Trust. Such agreements may include settlement agreements and qualified assignment agreements to effectuate settlements governed by sections 104(a)(2) and 130 of the Internal Revenue Code of 1986, as amended.

J.      *Discretion in Exercise of Power.* To do any other acts that it deems proper to effectuate the purpose hereof and to exercise the powers specifically conferred upon it by the Trust.

8.      **Advice of Counsel.** The Trustee may from time to time consult with counsel with respect to any question arising as to compliance with this Trust. The Trustee shall be fully protected, to the extent permitted by law, in acting in reliance upon the advice of counsel.

9.      **Trustee Compensation & Expenses.** The Trustee, and any successor Trustee, shall receive payment for services in accordance with the Trustee's

schedule of rates in effect at the time such compensations becomes payable, without reduction for any other fees or other compensation paid to consultants or others, except to the extent required by applicable law. The Trustee's compensation may be paid by the Trust, from the Trust funds, without Court approval. The Trustee shall be reimbursed for reasonable expenses, including travel expenses reasonably required and incurred by such Trustee in the performance of the Trustee's duties.

## 10. Successor Trustees.

A. *Vacancy Caused by Resignation or Removal.* The Trustee may resign as Trustee of any trust hereunder at any time by written notice delivered to the Court with continuing jurisdiction over this Trust. Such resignation shall be effective upon the written appointment of a successor Trustee. The Court shall have the power to appoint a successor Trustee. In default of such appointment, the Trustee shall petition the Court to appoint it successor. All of the Trustee's fees and expenses (including reasonable attorneys' fees) attributable to the appointment of a successor Trustee shall be paid by the Trust. No bond or other security shall be required of the Trustee or successor Trustee in any jurisdiction. Any successor Trustee shall have the same powers, authorities, and discretion as though originally named as the Trustee.

Exhibit H011

B.    *Acceptance of Appointment of Successor Trustees.* Acceptance of appointment of a successor Trustee shall be in writing and shall become effective upon receipt by the Court of notice of such acceptance. Upon the acceptance of appointment of any successor Trustee, title to the Trust shall thereupon be vested in said successor Trustee without the necessity of any conveyance or instrument. Each successor Trustee shall have all the rights, powers, duties, authority, and privileges as it initially named as a Trustee hereunder.

C.    *Preservation of Record of Changes to Trustees.* A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of the Trust in the custody of the Court.

**11.    Indemnity.** Each Trustee, whether initially named or appointed as successor Trustee, acts as a Trustee only in that capacity and not personally. With respect to any contract, obligation, or liability made or incurred by the Trustees, or any of them hereunder in good faith, all persons shall look solely to the Trust and not the Trustees personally. The Trustees shall not incur any liability, personal or corporate, of any nature in connection with any act or omission, of the Trustees in the administration of the Trust or otherwise pursuant to the Trust; except for any liability arising from gross negligence or intentional tortious or criminal acts such as fraud or theft. The Trustees initially named, or appointed as successor Trustees

Exhibit H012

by a Court, shall be indemnified and held harmless by the Trust. This indemnification and hold harmless provision shall cover all expenses reasonably incurred by such Trustee in defense of the aforementioned acts or omissions of the Trustee, including, but not limited to, reasonable attorney fees and costs. Except for the payment of all expenses reasonably incurred, this indemnification shall not apply to any liability arising from a criminal proceeding or acts where the Trustee had reasonable cause to believe that the conduct was unlawful.

12.     **Interpretation and Definitions.** As used in the Trust, words in the singular include the plural and words in the plural include the singular and masculine and neuter genders shall be deemed to include the masculine, feminine, and neuter. The description heading for each Section and Subsection of the Trust shall not affect the interpretation or the legal efficacy of the Trust. It is agreed the neither the act of entering into the Trust nor any contribution to the Trust nor any action taken under the Trust shall be deemed to constitute an admission of any liability or fault on the part of the Trustees, the Grantors, or the State, nor does it continue a commitment or agreement, either expressed or implied, by any or all of them to undertake any further activities outside the scope of the Trust. The following capitalized terms shall have these meanings:

A.     "Insured Claimant" shall mean an individual with a personal injury claim against Robinson Insulation Company and/or Grogan Robinson Lumber

Company which claim alleges an occurrence within period of insurance coverages beginning December 20, 1971, and ending May 28, 1986.

B.     "Receiver" shall mean the Court-appointed Receiver for the dissolved entities Robinson Insulation Company and Grogan Robinson Lumber Company.

C.     "Settlement Agreement" shall mean the attached Exhibit 1.

D.     The terms "Robinson Entities," "Grogan Entities," "Claims," "Insurers" and "Policies" shall have the meanings defined in the Settlement Agreement.

13.     **Choice of Law.** This Trust shall be administered, construed, and enforced according to the laws of the State of Montana.

DATED this 29th day of Sept., 2020

_____
Kent Saxby, Trustee

Exhibit H014